**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHERISE MCDANIEL, on behalf of herself and her son, E.E., MARSHETTA ROSS, on behalf of herself and hers son, M.R., and FRANCES NEWMAN AND ALPHONSO NEWMAN, on behalf of themselves and their son, A.S., on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, the CITY OF CHICAGO, and BARBARA BYRD BENNETT, in her official capacity as Chief Executive Officer, | ) ) ) ) ) | **Jury Demanded** |
| Defendants. | ) | |

## COMPLAINT

### Introduction

1.      In violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, the defendants propose to close 53 so-called "underutilized" schools and needlessly uproot, transfer, and destabilize the children represented by the plaintiff parents and thousands of other children in special education who will suffer academic, developmental and emotional setbacks as a direct result. By sending off these children to new and unfamiliar teachers, in new and unfamiliar schools, without any supportive services, and placing them in larger "inclusion" classes with non-disabled children, defendants will destroy the progress that the children have made or could make, and inflict irreparable injury on them. Defendants will also jeopardize the safety of children whose disabilities often place them at special risk. Finally, with an influx of

children from the 53 closing schools, defendants will also disrupt the programs for children in special education in the receiving schools and inflict the same irreparable injury on them as well.

2.     In violation of Title II of the ADA, the defendants are carrying out a program of school closings that will do more harm to children with disabilities than it will to their non-disabled classmates. Balanced against this irreparable harm, defendants will achieve little or nothing in cost savings – in the best case, less than 1 percent of the operating budget. Accordingly, defendants have violated their duty to provide a "reasonable accommodation" to these children by leaving them exactly where they are.

3.     In this class action under Fed. R. Civ. P. 23(b)(2) the plaintiff parents, on behalf of their children and others, seek the same identical injunctive relief for all class members. They have exhausted available administrative remedies and have no adequate remedy at law.

4.     Furthermore, since the defendant Chief Executive Officer Barbara Byrd-Bennett has cited budgetary reasons for the closings and since the Mayor of the City of Chicago controls the decisions as to the tax revenue available to the public schools, the City of Chicago is liable for any monetary relief to provide a reasonable accommodation to the plaintiff class.

5.     Furthermore, as set out in Count II, in violation of Section 5 of the Illinois Civil Rights Act of 2003 (ICRA), 740 ILCS 23/5, and by repeatedly selecting African American students to bear the costs of the closings, the defendants have unlawfully used "criteria and methods of administration" that have the "effect" of subjecting the plaintiffs' children and other African American children represented by the plaintiff parents to discrimination because of race. In conducting closings since 2001, the defendants have used various shifting criteria that they allege to be race neutral but that always have the effect of singling out poor and marginalized African American children to bear the educational and human costs of the closings.  For the 72

2

schools that defendants have closed to date, African American children make up more than 90 percent of the displaced children; and in currently proposed closings, they make up roughly 88 percent of the displaced children. Yet African American children constitute only 42 percent of the children in the public schools.

6. The impact on African American children is in stark contrast to the impact on white children – who have been almost universally insulated from the negative educational consequences of school closings. The 53 elementary schools selected by the CEO for closing have a combined enrollment of 125 white students out of a total enrollment of 16,059 students – less than one percent.

7. Despite repeated false claims that the closings have some education-related purpose, defendants have for more than a decade transferred African American children to schools that are equally failing or worse, and are equally or more segregated. Since 2001, defendants have carried out school closings so as to contribute to a form of racial and economic segregation, as destructive as older forms of intentional racial segregation. The closings to date have provided no educational benefit to the displaced children since they go to schools no better than those being closed, and for the same reason, none of the children in the proposed closings will gain any meaningful educational benefit to compensate for the negative impact of losing their neighborhood schools.

8. In the proposed closings, the "welcoming" schools are not better academically than the "closing" schools, are sometimes worse, and defendants have permitted no transfers into genuinely superior schools, including those with any significant white enrollment. Furthermore, defendants are carrying out the closings with the announced purpose of increasing class size to 30 or higher, and have repeatedly and falsely claimed this will benefit the children, despite ample

academic research that increasing class size causes significant harm to children in grades 1 to 3, especially low income children. Because once again African American children bear the costs of these closings, and represent roughly 88 percent of the children being displaced, plaintiffs seek preliminary and permanent injunctive relief against these actions.

9.      For violation of Section 5 of ICRA, plaintiffs have joined the City of Chicago as a defendant as well. The Board of Education of the City of Chicago has no effective independence from the Mayor, and the Board of Education is an instrumentality of the City of Chicago with respect to major financial and revenue policies used to justify the closings, as well as the decision as to which communities' children will shoulder the burden of the closings.

**Parties**

10.      Plaintiff Sherise McDaniel is the mother of E.E., an African American child who attends George Manierre Elementary School, which is one of the 53 elementary schools the defendants plan to close.

11.      E.E. has an Individualized Education Program (IEP) related to speech therapy and has a disability within the meaning of the ADA, 42 U.S.C. §12102 (1) and (2).

12.      Plaintiff Marshetta Ross is the mother of M.R., a ten year-old African American child who attends John Calhoun North Elementary School, , which is one of the 53 elementary schools the defendants plan to close.

13.      M.D. has cerebral palsy and has an IEP related to that permanent condition as well as for speech therapy.  M.D. has a disability within the meaning of the ADA, 42 U.S.C. §12102 (1) and (2).

14.      Plaintiffs Frances Newman and Alphonso Newman are the parents of A.S., an African American child attending Williams Preparatory Academy Middle School, which is one of the 53 schools the defendants plan to close.

4

15.     Defendant Board of Education of the City of Chicago is a body politic and corporate and is entrusted with the public education of all Chicago's children.

16.     Defendant City of Chicago is a body politic and corporate.

17.     Defendant Barbara Byrd Bennett is the Chief Executive Officer (CEO) of the Chicago Public Schools and is sued only in that official capacity.

**Jurisdiction**

18.      For Count I, Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

19.     This suit arises under the laws of the United States, including the enforcement provisions of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12133 which incorporates by reference the private right of action to enforce civil rights from Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*

20.     For Count II, plaintiffs invoke the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367, because the claim of race discrimination in violation of the Illinois Civil Rights Act as set out in Count II arises out of the same school closings challenged in Count I.

**Facts Relating To Count I**

21.     Plaintiffs Sherise McDaniel and Marshetta Ross bring Count I for violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

22.     E.E. has enjoyed meaningful educational advancement and personal development at George Manierre Elementary School (Manierre).

23.     M.R. has likewise enjoyed meaningful educational advancement and personal development at John Calhoun North Elementary School (Calhoun).

24.     The experiences of E.E. and M.R. are common to students with disabilities.

25.     Both E.E. and M.R. have benefitted from similar features at their respective schools including:

A.      The staff and administration at their respective schools are aware of their needs that require different accommodation than students without an IEP. This awareness was developed over time and experience.

B.      They are familiar with the other students at their respective schools and those students are familiar with them.  They enjoy strong peer relationships that have developed at the school over time that are important to their social and educational development.

C.      They enjoy small class sizes that are appropriate for their educational needs and also benefit from being included with their peers for part of the school day in certain classes.  Because the other students know them and have developed lasting relationships with them over time, their inclusion in classes with their peers is significantly enhanced.

D.      They enjoy living close to their schools in that their "commute" is short and through familiar blocks.

26.     Students with disabilities at the other schools slated for closure by the defendants enjoy and benefit from the same or similar features.

27.     These features meet some of the important goals of special education including the ability to socialize into the life of the school and establish stable relationships with teachers, with other adults, and with other children as well as the integration of special education students with the other students at the school.

28. Both E.E. and M.R. will lose these benefits upon the closing of their schools and their education will suffer as a result. For example, they will lose the significant benefit of class room inclusion that has been built over time because they will be thrust into a new peer group, unfamiliar with them and their needs. It is nearly certain they will be the targets of increased teasing from these new students or worse – and this teasing and targeting of them will harm and even erode their educational advancement.

29. Students with disabilities at the other schools slated for closure by the defendants will similarly suffer.

30. Because of their disabilities, E.E., M.R. and children like them have more trouble than normal adapting to change, which leads to lost learning time, emotional setbacks, and other difficulties.

31. One of the greatest risks to progress in special education is to disrupt the relationships of the plaintiff children with their teachers and with non disabled peers.

32. On March 23, 2013 defendant Byrd proposed to close 53 elementary schools.

33. By disrupting the relationships of the plaintiff children with their teachers and non disabled peers, and sending them to new and unfamiliar schools with new and unfamiliar teachers and students, the proposed closings will cause or are likely to cause significant academic and emotional setbacks for the plaintiff children.

34. When schools close children in special education typically suffer a loss of self confidence and self esteem that can lead to learning setbacks.

35. Such closings undermine the work of special education teachers, parents and entire school communities in socializing the children into a familiar and safe environment.

36.     There is a strong academic consensus among experts in special education that such transfers into new schools carry serious risks for children with disabilities like E.E. and M.R. and should be avoided to the greatest extent possible.

37.     Under state law governing the procedures for school closings, 105 ILCS 5/34-225, defendants are supposed to provide specific transition plans that identify specific services for children displaced at specific schools.

38.     No such plans exist as of the filing of this complaint – not for Manierre, not for Calhoun and not for the other schools affected by the closings.

39.     Instead, defendants have issued boilerplate or generic letters identical in every meaningful way for each school set to be closed.

40.     There is no explanation of the additional support services that should be provided to help these children to make the transition to an unfamiliar school, with unfamiliar teachers and unfamiliar students.

41.     Plaintiffs McDaniel and Ross, like other parents with children enrolled at school slated for closing, do not know whether the current teachers of these children will stay or go with the children to the new or receiving school.

42.     Plaintiffs do not know what specific services and resources are available for their children at the new or receiving school.

43.     It is also most likely that the class size for students at schools slated for closing will increase as the defendants have announced a general intent to layoff or discharge many teachers.  Such layoffs are certain to affect the overall student-teacher ratio and class size at the schools affected by the new round of school closings.

44.     The increased class size will be harmful to children like E.E. and M.R.

45.     Although children with disabilities take some of their instruction in "self contained" classes, i.e., small classes only for children with disabilities, they also take instruction in so called "inclusion" classes, with non disabled children.

46.     As a result of the consolidation and layoffs, children in special education will be in larger "inclusion" classes and it is unclear what effect there will be on the class size in their "self contained" classes.

47.     Defendants have a stated that the efficient class size is 30 students and have issued public statements approving class sizes of up to 40 students.

48.     The size of the "inclusion" classes is now likely or certain to increase to the great detriment of the plaintiffs' children and other children with disabilities.

49.     Regardless of the quality of the teacher, children with disabilities struggle to keep up when class sizes increase and they receive less individual attention.

50.     While a negative development for all students, the increase in class size is especially harmful to children in grades 1 through 3, and even more so where those children come from low income homes.

51.     In all other school districts in Illinois, only 30 percent of the children in the "inclusion" classes can be in special education.

52.     In Chicago, however, 40 percent of the children in an "inclusion" class can be in special education.

53.     By any standard, these larger classes will be disastrous for the plaintiffs' children and others at the schools affected by the announced closings and will prevent their educators from giving them the level of attention they need and deserve.

54.     The closings are certain to disrupt the progress that the plaintiff children and other children in special education have made and would continue to make if their schools were not closed.

55.     The expected influx of unfamiliar children and unfamiliar teachers from the closing schools will disrupt the progress made by children with special education who are now in the receiving schools.

56.     The closings also create specific and greater safety and physical risks for the plaintiff children and other children with disabilities.

57.     The plaintiff children and other children disabilities have a variety of problems – cognitive problems, physical limitations, autism, behavioral problems – that can make them targets of violence or less aware of danger around them.

58.     Furthermore, as a result of the closings, E.E., M.R. and other children like them will have to traverse some of the most violent and dangerous parts of Chicago.

59.     While these children already live in dangerous neighborhoods, some will have to cross gang boundaries and all or nearly of the children in the plaintiff class will now be going into strange and unfamiliar areas where neither they nor their parents can assess the risks, and where familiar and trusted neighbors cannot watch out for them.

60.     Recent reports explain that children are not sworn into gangs, but born into them based on the street on which they live.  Even if a child does not want to be associated with a gang, other people associate that child with the gang that controls the block(s) where the child lives, which further increases the risk that the child will face violence.

61.     In many communities, a street forms the boundary of competing gangs' territories.  For example, E.E. attends Manierre but will be transferred to Edward Jenner

Elementary Academy of the Arts (Jenner). It is commonly known that in this area of Chicago, Division Street is such a boundary – a boundary that the Manierre students will now need to cross in order to attend their new school at Jenner.

62. Not only will the students face greater risk of physical harm, but they will be at a greater risk for being pressed to join or affiliate themselves with a gang or be bullied.

63. In addition to the increased distance the students will walk, the loss of self-confidence and self-esteem that children with disabilities experience after schools close make them more vulnerable to being pressed into gangs by older children.

64. Furthermore, the plaintiff children and other children with disabilities lose the schools in their own neighborhoods, which are currently safe areas for them to congregate and play but will be rendered vacant, boarded-up eyesores and a neighborhood nuisance after the closings.

65. The defendants do not have in place any meaningful or clear plans to prevent these harms or otherwise address the special needs of children like E.E. and M.R. who are especially at risk because of their disabilities.

66. Defendants held public hearings with Independent Hearing Officers for each of the schools it plans to close.

67. Independent Hearing Officers opposed the closings of 13 schools and often did so because of the lack of specific safety plans.

68. The Honorable David Coar, former United States District Judge was the independent hearing officer for the challenge to the closing of Mahalia Jackson Elementary and found after an evidentiary-type hearing that no intelligible safety plan existed for the children, other than vague assurances that defendants will take care of things using to-be-disclosed

measures. *See* Exhibit A. That finding applies to each and every other school set to be closed – namely, that a generic form letter coupled with the lack of an actual transition plan or the time to prepare students and staff for a successful transition is insufficient to provide the necessary specific measures to protect children like E.E. and M.R.

69. Other hearing officers – all retired judges – noted the lack of specific safety plans at the schools whose hearings they reviewed, including the hearing officers for Manierre and Calhoun. Each made findings that the safety and transition plans are inadequate for the children at those schools including E.E. and M.R.

70. In every case, the risk found by the hearing officers for *all* children is significantly greater for children with disabilities, like E.E. and M.R., because their disabilities make them less aware of the dangers or make them more likely to be the target of gangs.

71. Furthermore, the defendants have demonstrated an inability to manage prior school closings and are especially unable to keep track of or prevent harm to children with disabilities like E.E. and M.R.

72. In a study of children displaced by closings in 2012, based on data provided by defendants, *Catalyst* magazine found that the majority of children displaced by the closings ended up in schools other than those to which they were assigned.

73. Furthermore, based on data provided by defendants, 11 percent of the children could not be accounted for, and defendants do not know where they are. If the same holds true after the closing of the 53 schools the defendants have targeted, 1766 students will be unaccounted for at the start of the new school year in just three months and the defendants have taken no steps to ensure that their past failures do not repeat on an exaggerated scale.

74.     E.E., M.R. and other children with disabilities are especially at risk and likely to be harmed from such mismanagement of closings.

75.     In 2012, the defendants initiated the closings as early as February and had a longer time frame to carry out the process.

76.     By contrast, the defendants will initiate the closings at the end of May, with just 96 days from the School Board voting to close the schools to the first day of the next school year.

77.     There is no time for the school staff to carry out the drastic changes required to accomplish the school closings and consolidations.  For example, he last day of school at Track E schools is June 19, 2013 which is only 28 days after the school board will approve the closings.   This is not enough time to accomplish even a marginally successful school consolidation let alone complete the current school year.

78.     This time frame is especially too short to address the transition of IEPs of students like E.E. and M.R or to acclimate them to their new school and peers and to adequately integrate the two school populations.

79.     In contrast to the two school closings in 2012, defendants now propose to close 53 schools.

80.     The risk of such mismanagement is exponentially greater because of the greater number of closings and the shorter time frame in which they will occur.

81.     The plaintiff children and other children have special needs – including counseling and field trips to the new schools – as a result of the closings.

82.     Since the plaintiff children and other children with disabilities need individual attention and counseling in connection with the closings, they will be far more likely to suffer from the lack of time and disruption from the closings proposed here.

**Underutilization**

83.     The defendants justify the closings on the ground that the schools are "under-utilized," i.e. that there are too many empty classrooms.

84.     However, the particular criteria for determining "underutilization" are in themselves discriminatory against children with disabilities.

85.     Defendants found schools to be underutilized based on the criterion that there should be an average of 30 students in a class.

86.     In determining underutilization based on this average of 30 students, defendants disregarded the number of special education students in a school and the number of self contained classrooms needed to provide these students their required services.

87.     Each of these self contained classrooms is necessarily "underutilized."

88.     In other words, all class rooms devoted to special education – in which there may be only eight students in a class – contributed to a finding that the building was underutilized.

89.     As a result, defendants were more likely to close schools that offered special education programs, or have self contained classes.

90.     In finding that a school was "underutilized," the defendants actually *counted* the existence of special education classes for a limited number of students to establish that the school was underutilized by failing to account for the presence of self contained classrooms.

91.     This fact was noted by at least one independent hearing officer who evaluated defendants' plan and justifications for the closings.

92.     So, for example, in the case of Lyman Trumbull Elementary School (Trumbull), which has a "cluster" of special education programs and many students in special education, defendants used that fact to justify the closing of the school.

14

93.     The letter attached as Exhibit B hereto sets out how defendants had a policy that discriminated against schools that offered "too much" special education and failed to account for an important factor relating to school utilization in an arbitrary manner.

94.     In these respects, the underutilization criteria used to justify the closings discriminate against children with disabilities and are by themselves violations of Title II of the ADA and Section 504 of the Rehabilitation Act.

**Cost Savings**

95.     The defendants claim inaccurately that the closings of the 53 schools will save up to $43 million in operating costs each year.

96.     Even under this scenario, the costs savings are insignificant and would amount to less than 1 percent of the operating budget of Chicago Public Schools, which is now more than $6 billion a year.

97.     However, defendants cannot know or ascertain how much they will save since they do not know how long it will take to dispose of the empty buildings – or whether they can dispose of them at all.

98.     The cost of maintenance of the buildings will also vary considerably from building to building.

99.     A position paper prepared for defendants states that the savings could be as low as $140,000 a year per building.

100.    In the meantime, to carry out the closings, the defendants will issue or have issued bonds of $325 million.

101.    The debt service – the annual cost of the interest on new bonds in this amount – will be approximately $25 million a year on those bonds.

102.    The net savings in operating costs – if debt service on the bonds is included – could be considerably smaller than 1 percent or even negative.

103.    Defendants have also inflated capital costs in justifying the closings.

104.    Defendants initially claimed that over ten years the closings will save over $560 million in capital costs.

105.    Defendants have now conceded that the long term capital costs are significantly lower, namely, $437 million instead of $560 million.

106.    However, the lowered costs are in conflict with or inexplicable in light of the projected costs for the buildings that defendants had previously made.

107.    For many buildings, the defendants have significantly raised the prior estimate, with no explanation for the increase in the absence of any new or different assessment of the building.

108.    For example, in 2010, the defendants' own figures showed required capital investment at Trumbull as roughly $4.9 million.  But in 2013, in support of closing Trumbull, the defendants calculated its required capital investment as roughly $16.3 million, which was later downgraded to $15.3 million.

109.    The same patter was true for Elizabeth Peabody Elementary School (Peabody).  In 2010, its required capital investment stood at $3.3 million which was revised by the defendants to $11.5 million in 2013 and then downgraded to $10.9 million.

110.    Wholly missing from any cost-benefit analysis was the very real "cost" to the students like E.E. and M.R. who will bear the burden of these closings.  The defendants provided no such analysis as part of the public hearing process in advance of the closings.

**Educational Benefit**

111.    The plaintiff children and other children with disabilities will obtain no educational benefit as a result of the closings.

112.    The majority of "welcoming" schools that will absorb students from the closed schools are so-called "Level II" schools under the defendants' Performance Policy.

113.    Regardless of what level the school is rated under the defendants' Performance Policy, no student will be sent to a school that is in any meaningful way educationally superior as a result of the defendants' planned closings.

114.    The closings will cause academic and emotional setbacks to the plaintiffs' children and other children with disabilities because they will be in new and unfamiliar environments with new and unfamiliar teachers, surrounded by new and unfamiliar students.

115.    The overwhelming academic research shows that such displacements of children in special education are especially harmful to these children.

116.    A leading study of the effect of school closings prepared by the RAND Corporation in 2011 found that unless students of closing schools are transferred to schools that perform radically better, i.e., from a 25th percentile school to a 75th percentile school, the students will suffer "a large, initially significant and apparently persistent drop in achievement" in both math and reading.

117.    The closings planned by the defendants will not transfer students to significantly better schools and will fail to mitigate the "significant" and "persistent" drop in achievement that the roughly 16,000 elementary students currently attending the to-be-closed schools can expect to suffer.

**Irreparable Injury**

118.    Unless the proposed closings are restrained by this Court, the defendants will inflict irreparable injury on the proposed class of disabled elementary school children.

119.    The purpose of all special education – for the plaintiff children and all other children in special education – is to build up relationships of trust with familiar teachers, familiar classmates, in a familiar and safe environment.

120.    It is only in this way that the plaintiff children and other such children have made and can make academic and emotional progress, and achieve the inclusion with non disabled children that is the goal of special education.

121.    By scattering these children to new and unfamiliar schools, with new and unfamiliar teachers, in new and often threatening environments, defendants are about to implement actions that will destroy or lose the value of years of this work on behalf of plaintiff children and cause serious academic and emotional setbacks.

122.    Furthermore, because of their disabilities, the plaintiff children and other children in the class are at special risk and especially vulnerable of being teased, bullied, pressed into gangs by older children.

123.    They are at special risk, compared to non-disabled children, of the violence from gangs and other sources as to which – as the Honorable David Coar has found – the defendants have no meaningful preventive measures in place.

124.    If the closings occur, the children – not just in the closing schools but also the receiving schools – will have no adequate remedy at law.

125.    Once the schools are closed it is impossible to put back the status quo, and the very subject matter of this legal action will be destroyed, notwithstanding the likelihood of success on the merits of these legal claims.

126.    Furthermore, even before the schools close, the plaintiff children and other children in special education are already finishing the year in demoralized schools, and many of these children may already internalize a sense of blame for the loss of the schools, the loss of their special education teachers, and the loss to the neighborhoods in which they live.

### Class Action Allegations

127.    Pursuant to Fed. R. Civ. P. 23(b)(2), plaintiffs Sherise McDaniel and Marshetta Ross seek to certify a class of all children who are currently in special education programs but attend general education or "inclusion" classes with non disabled students at one of the 53 elementary schools the defendants plan to close (the ADA Class).

128.    The proposed class includes more than 5000 students – far too many to join in a practical manner.

129.    The proposed class seeks not individual relief but only an order restraining conduct that affects the class as a whole because it has a particularly adverse effect on the class members compared with their non-disabled peers.

130.    Common questions of law and fact will dominate the resolution of the claims of any individual class member, especially as the defendants have acted under uniform policies.

131.    The claims of plaintiffs are typical of those of class members.

132.    Plaintiffs will adequately represent the interests of the class and have retained counsel experienced in class litigation and civil rights litigation.

### Count I
### Violation of the ADA: Discriminatory Effect

133.    By the acts set forth above, and in violation of Title II of the Americans with Disabilities Act, the defendants will carry out 53 elementary school closings that will have

harsher and discriminatory impacts on the plaintiffs and other disabled children relative to their non-disabled or less disabled peers.

134.   Defendants have violated their duty under Title II of the ADA to provide a reasonable accommodation to the plaintiff children by keeping them where they are and avoiding the harsh and discriminatory effects of the closings on the plaintiff children and other children with disabilities.

135.   Furthermore, in selecting schools for closings, defendants have used "underutilization" criteria that are unlawful under Title II of ADA because such criteria count special education instruction given to plaintiff children and others in order to prove that their schools are underutilized.

136.   The City of Chicago is also liable for necessary and appropriate relief.

137.   The Mayor of the City of Chicago appoints the members of the defendant Board of Education.

138.   The Mayor of the City of Chicago is responsible for making the decisions that determine the amount of revenue the Chicago public schools receive, notwithstanding that the Mayor has no statutory authority to do so.

139.   Plaintiffs allege on information and belief that the Mayor has the actual authority to control whether and how many school closings occur.

140.   Accordingly plaintiffs seek an order that the City of Chicago is liable for providing to plaintiff children any relief deemed reasonable by this Court on a joint and several basis with the other defendants.

141.   Unless the closings are restrained by this Court, the plaintiff children and class members will suffer irreparable injury.

142.    Plaintiff children have no timely administrative remedy to prevent such irreparable injury or adequate remedy at law.

WHEREFORE plaintiffs pray this Court to:

A. Certify the class proposed above pursuant to Fed. R. Civ. P. 23(b)(2),  for declaratory and class wide injunctive relief;

B. Declare that by the acts set forth above the defendants, including the City of Chicago, threaten to violate or will violate the rights of the plaintiffs' children and others under Title II of the ADA to be free of actions that have particular discriminatory effects against them, and do more harm to them than to children without such disabilities;

C. Enjoin the defendants from carrying out the proposed closings of Manierre, Calhoun and any other school set for closing by defendants;

D. Direct defendants, including the City of Chicago, to provide a reasonable accommodation to plaintiff children and other children with disabilities by keeping such children in the schools they currently attend; and

E. Grant plaintiffs their legal fees and costs and such other relief as may be appropriate.

**Count II**
**Violation of the Illinois Civil Rights Act**
**Additional Facts Relating to Count II**

143.    Pursuant to Fed R. Civ. P. 23(b)(2), plaintiffs Sherise McDaniel, Marshetta Ross, Frances Newman and Alphonso Newman, bring this count on behalf of themselves, their children and all other African American children who will be affected by the proposed closings..

144.    Plaintiffs' children and other African American children make up roughly 88 percent of the children who will be displaced by the proposed closings – and who will suffer generally acknowledged negative impacts of such closings.

145.    At the same time plaintiff children and other African American children make up only 42 percent of all the children in the Chicago public schools.

146.    From 2001 to the present, under allegedly "race-neutral" rationales that change from year-to-year, the defendants have chosen to close, with token exceptions, schools that poor and disadvantaged African American children attend.

147.    Whatever the rationale, the defendants adopt policies that impose the costs of school closings almost entirely on African American children, including the plaintiffs' children in the coming year.

### Closings to Date: 2001 to 2012

### Racial Impact

148.    From 2001 to date defendants have actually closed 72 neighborhood schools.

149.    In those 72 closings, over 90 percent of the displaced children have been African American.

150.    Thousands of these children were homeless or suffered from extreme poverty and lived in racially isolated neighborhoods.

151.    The closings of these schools had a negative and stigmatizing impact on the children and certainly did not enhance their education.

152.    The closings also disrupted and destabilized their neighborhoods.

153.    The closings took away the schools which were safe places for the children to congregate and play.

154.    The closings also eliminated local school councils and removed an important representative institution for African American parents to voice their grievances and have some input and control over the education of their children.

155.    The closings help to continue the historic racial segregation of these children – and add to it a form of economic segregation worse than in former decades.

156.    Such racial and economic segregation interferes with the children's actual ability to learn, inhibits their educational advancement and traps the children in poverty.

157.    The closings also demoralize the neighborhoods in which the children live.

158.    The repeated closings remove community institutions that are crucial to neighborhoods afflicted with poverty and crime.

**Pattern of Selection**

159.    Furthermore, the defendants often closed so called "all Black" schools when white persons began to move nearby or real estate prices in the area began to rise, starting a cycle of gentrification.

160.    These areas included West Town, Bronzeville and other areas near the Loop

161.    Of the 72 schools closed by defendants prior to this year, over 40 of them were all Black or nearly all Black schools in these areas.

**Lack of Educational Benefit and Other Harms**

162.    Prior to 2013, defendants sought to justify the closings on the ground that the schools are "failing," and that the closings would benefit the children.

163.    Notwithstanding this excuse, defendants repeatedly sent the children to schools that were equally failing or inferior.

164.    Furthermore, defendants did comparatively little to assist the receiving schools to provide any benefit to the displaced children.

23

165. For example, defendants did not provide funding comparable to the funding given to private vendors to improve schools in the case of so-called "turnarounds."

166. Defendants also sent the children to schools that were more racially and economically isolated from economically well off areas than the schools that had been closed.

167. Defendants did not transfer the children to the best schools in the system or to schools that had any significant population of white students enrolled.

168. As found in a 2009 study by Consortium on Chicago School Research at the University of Chicago, the children displaced by such closings received no educational benefit to justify such closings.

169. As explained in the RAND Corporation mentioned above, these closings likely were related to a significant and persistent drop in educational achievement by the African American students subjected to them.

170. As found in the Consortium study, defendants send such low income African American children to schools that are no stronger and the children achieve no academic gains, and at least temporary, if not persistent, setbacks.

171. Other studies have shown significant academic harm from closings of schools with low income and minority race children.

172. Furthermore, children with learning and emotional disabilities – of whom a high proportion are African American children from poor and violent neighborhoods – did suffer such setbacks.

173. The effect of the closings has not been to improve academic quality or have any beneficial effect but instead to further trap the poorest African American children in

neighborhoods and areas that are racially and economically cut off from parts of the city where conditions are improving.

174.    Furthermore, the closings increased that racial and economic isolation by removing the school as a safe area and community institution and contributing to making the neighborhoods more dangerous.

**Intentional Misconduct**

175.    To continue closings with such racially disparate impacts, defendants have repeatedly contrived to evade or go around state laws that seek to limit such impact.

176.    By legislative enactments in 2010 and 2011, and in provisions set forth in Section 34-18.43(a)(4) and (5) and Section 34-230 of the Illinois School Code, the General Assembly responded to the evident pattern of racially disparate actions by defendants.

177.    The General Assembly established a task force – the Chicago Educational Facilities Task Force – to ensure the Board of Education used clear and system wide criteria in conducting such closings and avoided disparate racial impacts.

178.    Nonetheless, defendants claimed that laws like Section 34-18.43(a)(4) and (5) did not limit their discretion and were only policy statements that could be brushed aside, regardless of the racial impact of the closings.

179.    Accordingly, in 2011 and 2012, defendants continued the pattern of closing all or nearly all Black schools without system wide criteria and knew or should have known that they were evading legislative intent to limit the racial impact of the closings.

180.    On January 12, 2012 the CEFTF found that the defendants had actually violated Section 34-230 which required the use of genuine criteria and not vague "considerations" in determining which schools would be closed.

181.    During this same period defendants acknowledged that they were making decisions to close schools five to ten years in advance.

## Setting Up the Schools to Close

182.    Mr. Tim Cawley is the chief administrative officer of the Chicago public schools.

183.    In a statement quoted in the Chicago Tribune on December 15, 2011, Cawley acknowledged that such decisions were being made five to ten years in advance.

184.    He further stated that during this period of five to ten years defendants had a policy of not providing new funding to these designated schools.

185.    None of the parents of children in these secretly designated schools knew of these unannounced decisions or of the policy to provide no new money or funding to their schools.

186.    For a five to ten year period, defendants let the schools run down without the knowledge of the children or the parents.

187.    Such schools may include some or all of the 53 elementary schools now set to be closed.

188.    Such policies show a contemptuous disregard for the welfare of the African American children selected to bear the burden of these closings.

## Proposed Closings: 2013

189.    Now in 2013 defendants have proposed the largest school closings in the history of American public education.

190.    The closings will affect over 23 percent of all elementary-school aged African American children in Chicago.

191.    Once again defendants will displace African American children who are disproportionately poor and – at times – homeless and living in racially and economically isolated areas of the city.

192.    The purported rationale or reason for the closings has changed again: this time the defendants seek to justify closing schools attended b African American children because they are allegedly "under utilized."

193.    However, the criteria of underutilization discriminate against schools that have children in special education, as set forth in Count I above.

194.    Because of poverty and homelessness, a higher percentage of African American children are in special education.

195.    Defendants have not seriously considered other means to utilize the buildings effectively – including the use of school buildings to serve other, community-related functions or the redrawing of attendance boundaries to balance enrollment across schools it believes to be under utilized and over utilized.

196.    Defendants have also repeatedly turned over the vacant school buildings to charter schools that have comparable student populations.

197.    Furthermore, defendants have not consistently given underutilization as a justification for their decade-long program of closing African American schools.

198.    Through October 2012, the defendants were continuing the policy of closing only schools alleged to be "failing."

199.    In October 2012, defendants announced that they were going to close schools that were allegedly underutilized, and to do so to address a projected budget deficit of over $1,000,000,000 ($1 billion).

200.    However, the closings will not reduce but increase next year's budget deficit.

**Lack of Educational Benefit**

201.    The defendants recently have justified their proposed mass closing of African American elementary schools by claiming that all the children affected will go to academically stronger schools.

202.    However, as set forth in Count I, the receiving schools are not academically superior in any meaningful way.

203.    Based on performance on standardized tests, at least a third of the schools set to be closed surpass the receiving schools to which students will be transferred.

204.    Furthermore, in the few cases where defendants had the option of sending the students to a school that was truly racially integrated or had any significant white student enrollment, they refused to do so and instead insulated students at those schools from bearing educational costs of the defendants' school closings.

205.    The defendants also claim that children will benefit by allowing them to "concentrate" resources.

206.    However, as set forth in Count I, this "concentration of resources" means increasing class size to 30 or more, even for children in special education.

207.    As demonstrated by Tennessee's Project STAR study of the effect of class size on education, and by other academic writing and research, increasing class size is harmful, especially to children in grades 1 through 3.

208.    As further demonstrated by the Project STAR study, increasing class size has a greater and disparate impact on low income African American children.

**Lack of Savings**

209.    For all the reasons set forth in Count I, defendants know or should know that any savings from the closings are speculative, difficult to ascertain and have not been weighed

against the educational and developmental costs the closings will place on thousands of elementary school children.

210. There is no reasonably ascertainable benefit to justify the enormous cost of selecting out African American children to bear the costs of closings.

211. For example, defendants are proceedings with closings when they have no buyer for the building they are emptying and no planned alternative use for the building at all.

212. A planning document prepared for defendants in September 2012 and "leaked" to the Chicago Tribune estimated that the savings per building may be as low as $140,000 a year, or a savings of under $10 million a year.

### Allegations Relating to Charter Schools

213. The proposed closings of the 53 elementary schools will facilitate the ability of defendants to open more charter schools.

214. Over 40 percent of the buildings that were closed from 2001 to 2012 have been turned into charter schools.

215. As defendants close 53 neighborhood schools, they are planning to open eight new charter schools.

216. In the next five years defendants are expected to open up to 60 new charter schools.

217. While African American children disproportionately bear the costs of closings, they will not benefit from the opening of new charter schools.

218. By clearing African American children out of 53 school buildings, defendants can facilitate the expansion of charters.

219. Some of the charter school operators are politically connected to elected representatives of the City of Chicago.

220. Such leases or sales are likely to be on favorable terms to the charter school operators.

221. Funding for charter schools has diverted funding from the maintenance of neighborhood schools attended by African American children and contributed to the closings of such schools.

### Allegations Relating to the City of Chicago

222. Defendants have also justified the closings as necessary to meet projected budget deficits.

223. Under state law, including Section 34-18 of the Illinois School Code, 105 ILCS 5/34-18, the Board has the exclusive responsibility for the management of the Chicago public schools, including all decisions with respect to the tax rate to be levied upon the taxpayers of the school district.

224. Under state law, the Mayor of the City of Chicago has no statutory authority for making such decisions.

225. Nonetheless, in violation of state law, the Mayor exclusively makes such decisions which determine the funding available to the Chicago public schools, which are overwhelmingly enrolled with minority children.

226. For example, in a an April 15, 2011 story published by the Chicago Tribune titled, "Emanuel and Daley oppose CPS tax hike," it was stated that:

"A report on the CPS budget sent to Daley's office floated the idea of a tax hike, but it never got past the mayor's chief of staff, Raymond Orozco, according to mayoral spokesman Jacquelyn Heard.

'(Orozco) did read through it, and did get back to them to say it was totally unacceptable, and he wouldn't even present it to the mayor,' Heard said. 'He knows that the mayor would never accept such a proposal.'

Daley said he had not seen the report but rejected the idea of a tax increase during the remainder of his term.

'We've been against any tax increases whatsoever – by the Park District, the city, City Colleges or even the Chicago Board of Education," Daley said. 'That's off the table. It's always been off the table.'"

227.    Currently the total tax rate for the Chicago public schools is 2.37 percent.

228.    Out of 386 school districts in the state, the total tax rate for the Chicago public schools is the second lowest in the state.

229.    The total tax rate is significantly below the tax rate of other school districts which have similar property tax wealth as defined by the equalized assessed valuation of property in the district per student.

230.    School districts with comparable EAV's per student have the following higher rates: Naperville, 3.89 percent; St. Charles, 3.67 percent; Wheaton, 3.31 percent, Champaign, 3.57 percent; and Carpentersville, 3.44 percent.

231.    However, in contrast to all or nearly all other school districts in Illinois, there is a significant disconnection in the racial composition of those who pay the property tax and those who attend the public schools.

232.    In Chicago, those who pay the majority of the property tax to support the public schools are white.

233. On the other hand more than 90 percent of the children who attend the public schools are non-white minorities.

234. Of these children, African American children have been and continue to be selected out by the Board to make sacrifices in order to close the budget deficits created by the failure of defendants to make the financial effort that other districts make.

### Irreparable Injury

235. Unless the proposed closings are restrained by this Court, defendants will inflict irreparable injury upon the proposed classes of elementary aged children.

236. School closings have an acknowledged negative impact on the children who are displaced, including the plaintiff children and the other African American children who will be displaced.

237. The negative impact is even greater when the closings have the effect of discriminating against children because of race.

238. The children displaced by these closings are being stigmatized because of race: that is, they are marked not only as children of "failing" schools, but carry a badge of inferiority that is completely undeserved and unfair to these children.

239. The continued racial and economic segregation of African American children interferes with the actual ability of the children to learn and achieve their potential.

240. Plaintiffs have previously set forth in Count I the irreparable injury to children with disabilities, and Count II incorporates such allegations.

241. A high proportion of children with learning and emotional disabilities are African American because of policies like those of the defendants being challenged here to isolate these children racially and economically.

242.    These children with disabilities in turn will suffer in an acute and special way because it is convenient for defendants to select out African American children to bear the costs of closings rather than conduct such policies with a due regard to avoiding such racial impact.

243.    Furthermore all the children displaced by these closings will be at special risk of violence both from the closings and from policies that have led to their economic and racial isolation from better off parts of the city.

244.    As set forth in the findings and recommendation of independent hearing officers like the Honorable David Coar, there are no specific safety plans in place to protect the children from violence.

245.    Put bluntly, the plaintiff children and all other African American children in the proposed class are at greater risk of being bullied, attacked, assaulted, or subject to even more serious harm, literally as a result of the closings of these schools.

246.    Unless these actions are restrained by this Court, the lives of these children will be in greater danger in a serious and appreciable manner.

247.    Once the children are put at risk in the months ahead, there is no adequate remedy at law that will compensate them or their parents for the very reasonable fear, anxiety and intense emotional distress of sending their children through some of the most violent areas not just of Chicago but of the entire United States.

248.    There can be no greater irreparable injury under the law than the injury these children face.

249.    Furthermore, if the closings go forward, the defendants will have succeeded in destroying the subject matter of this suit, which should be set down for hearing.

250.    Defendants will suffer no harm – and the plaintiff children and the community will only gain – if the process is slowed down so that even plaintiffs fail on the claim in chief, the closings would then go forward in a more carefully planned and deliberate manner than the current timetable allows.

### Class Allegations

251.    The proposed class for Count II meets all the requirements of Fed. R. Civ. P. Rule 23(a).

252.    The proposed class consists of all African American children affected by the proposed closings – including children in both the closing and receiving schools (the Race Class).

253.    The class members are too numerous to practically join individually.

254.    There are issues of law and fact common to the class including whether the defendants used "criteria and methods of administration" that have the "effect" of subjecting members of the class to discrimination because of their race.

255.    The claims of the plaintiffs to have their children be free of policies that have the effect of subjecting them to racial discrimination are typical of the claims of the class.

256.    Plaintiffs will adequately represent the interest of the class and have retained counsel experienced in class action and civil rights litigation.

### Violations of Illinois Civil Rights Act

257.    In violation of Section 5 of the Illinois Civil Rights Act, 740 ILCS 23/5, and by causing and selecting African American students to bear almost the entire negative impact of closing public schools, and doing so under various and shifting pre-textual criteria that are supposed to appear "race-neutral," or alternatively without valid cause and in the absence of

good faith, the defendants have used criteria and methods of administration that have the effect of subjecting the plaintiffs' children to discrimination because of their race.

258.     In violation of Section 5 of the Illinois Civil Rights Act, 740 ILCS 23/5, and by causing and selecting African American students to bear almost the entire costs of these closings and doing so in a manner that disregards or fails to serve any legitimate interest of these children the defendants have used criteria and methods of administration that have the effect of subjecting plaintiff children to discrimination because of race.

WHEREFORE plaintiffs pray this Court to:

A.  Certify the class proposed above pursuant to Fed. R. Civ. P. 23(b)(2);

B.  Declare that the proposed closings violate the rights of the plaintiff class under Section 5 of the Illinois Civil Rights Act, 740 ILCS 23/5;

C.  Enjoin the defendants on a preliminary and permanent basis from proceeding with the closings and other policies that have the effect of subjecting the plaintiff children to discrimination because of their race; and

D.  Grant plaintiffs their legal fees, costs and such other relief as may be appropriate.

**Jury Demand**

Plaintiffs hereby demand a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

35

Dated: May 14, 2013                                  By:   /s/ Thomas H. Geoghegan
                                                          One of Plaintiffs' Attorneys


Thomas H. Geoghegan
Sean Morales-Doyle
Michael P. Persoon
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

Robin Potter
Shankar Ramamurthy
Patrick Cowlin
Robin Potter & Associates, P.C.
111 E. Wacker Drive #2600
Chicago, Illinois 60601
(312) 861-1800

Randall D. Schmidt
Edwin F. Mandel Legal Aid Clinic
  of the University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611