**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHERISE McDANIEL, on behalf of herself and her son, E.E., MARSHETTA ROSS, on behalf of herself and her son, M.R., , FRANCES NEWMAN and ALPHONSO NEWMAN, on behalf of themselves and their son, A.S., on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) | 13 C 3624 |
| Plaintiffs, | ) ) | Judge John Z. Lee |
| v. | ) ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, BARBARA BYRD-BENNETT, Chief Executive Officer, and CITY OF CHICAGO, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sherise McDaniel, Marshetta Ross, and Frances and Alphonso Newman (collectively "Plaintiffs") are parents whose children are enrolled in special education programs in Chicago public schools that are slated to close before the commencement of the 2013-2014 school year. They have sued the Board of Education of the City of Chicago ("Board") and Barbara Byrd-Bennett, the Chief Executive Officer of the Chicago Public Schools ("CPS") (collectively "Defendants"), on two counts. In Count I, Plaintiffs McDaniel and Ross allege that Defendants will disproportionately harm students with disabilities and fail to reasonably accommodate these students by closing schools using a selection process that violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. In Count II, all four Plaintiffs allege that Defendants used a selection process that resulted in African-American students bearing almost the entire burden of the school closings in violation of the Illinois Civil Rights

1

Act ("ICRA"), 740 Ill. Comp. Stat. 23/5.  Under both counts, Plaintiffs seek an injunction preventing the proposed school closures.

Defendants move to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that Plaintiffs lack standing to bring their claims because they have not alleged that they have suffered an injury-in-fact, and that Plaintiffs have failed to state claims of either disparate impact discrimination or failure to reasonably accommodate under the ADA.  Defendants also argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law ICRA claim, especially if Plaintiffs' ADA claims are dismissed.  For the reasons stated herein, Defendants' motion is denied.

## Background

The following facts are taken from Plaintiffs' Complaint and are accepted as true for purposes of resolving this motion to dismiss.  *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

On March 23, 2013, CPS CEO Byrd-Bennett proposed to close 53 CPS elementary schools before the commencement of the 2013-2014 school year, including the elementary schools that Plaintiffs' children attend. (Compl. ¶¶ 10, 12, 14, 32.)  In May 2013, the Board met to approve the closings.  (*Id.* ¶ 76.)

### I. Facts Relevant to Plaintiffs' ADA Claims

Plaintiff McDaniel's and Ross's children are enrolled in special education programs and have Individualized Educational Programs ("IEPs") related to their special needs.  (*Id.* ¶¶ 10-13.)  Over time, the staff and administration at the children's schools have become aware of their special needs, and the children have developed strong peer relationships that are important to their social and educational development.  (*Id.* ¶ 25.)  The children also enjoy small class sizes and short, familiar commutes to and from school.  (*Id.*)

Once their schools close, however, children in special education programs allegedly will lose these benefits and will suffer significant emotional and academic setbacks. (*Id.* ¶¶ 28-30.) According to Plaintiffs, these children will be thrust into new peer groups and will nearly certainly be targets of increased teasing. (*Id.*) Their relationships with their teachers will be disrupted. (*Id.* ¶ 33.) And they will mostly likely be placed in larger classes in the new schools because Defendants have announced a general intent to layoff or discharge many teachers. (*Id.* ¶ 43.) Plaintiffs also assert that the harm to their children in special education programs will be greater than the harm to general education students because students in special education typically suffer a loss of self-esteem and confidence when schools close. (*Id.* ¶ 34.)

Additionally, Plaintiffs allege that Defendants have not issued specific safety plans for children, who will be required to walk through new and unfamiliar neighborhoods in dangerous areas of the city. (*Id.* ¶¶ 58-59.) Plaintiffs claim that children with special needs are especially vulnerable because they are less aware of danger around them, and the closings will lower their self-esteem, making them likely targets for recruitment into gangs. (*Id.* ¶¶ 57, 62-63, 70, 122.) Furthermore, Plaintiffs allege that, due to the short time period between the Board's approval of the school closings and the commencement of the 2013-2014 school year, it will not be possible for the children's IEPs to be adequately revised, or to conduct the meetings with parents and administrators that are necessary to revise them. (*Id.* ¶¶ 76-78.)

Finally, Plaintiffs claim that, when deciding to close schools that were "underutilized," Defendants considered classes within a school to be "underutilized" if a class had less than thirty students. (*Id.* ¶¶ 83-85.) According to Plaintiffs, because special education classes often had less than thirty students, Defendants' utilization analysis resulted in the disproportionate closure of schools with special education classes. (*Id.* ¶¶ 86-89.)

## II.     Facts Relevant to Plaintiffs' ICRA Claim

The children of Plaintiffs McDaniel, Ross, Frances Newman, and Alphonso Newman are African-American. (*Id.* ¶¶ 10, 12, 14.) As alleged, African-American children make up roughly 42 percent of all children in CPS, yet African-American children make up roughly 88 percent of the children who will be displaced by the school closings. (*Id.* ¶¶ 8, 144-45.) Thus, according to Plaintiffs, African-American children will disproportionately suffer the generally acknowledged negative impacts of such closings. (*Id.* ¶ 144.) Additionally, Plaintiffs allege that because the criteria Defendants used to identify schools for closure resulted in the disproportionate closure of schools that offered special education programs, and because a higher percentage of African-American children are in special education, African-American children are disproportionately harmed by the criteria used. (*Id.* ¶¶ 193-94.) Moreover, according to Plaintiffs, based on standardized test performance, at least one-third of the schools set to close outperformed the schools to which students will be transferred. (*Id.* ¶ 203.)

## Discussion

### I.     Plaintiffs' ADA Claims

Defendants have moved to dismiss Plaintiffs' ADA claims pursuant to Rules 12(b)(1) and 12(b)(6). The purpose of a motion to dismiss under either Rule 12(b)(1) or 12(b)(6) is to test the sufficiency of the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 457 (7th Cir. 2007); *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). Rule 12(b)(1) requires dismissal of claims over which the federal court lacks the "statutory or constitutional power to adjudicate the case" (referred to as subject matter jurisdiction). *United States v. Lawrence*, 535 F.3d 631, 636 (7th Cir. 2008). Rule 12(b)(6) requires dismissal of complaints that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Defendants move to dismiss pursuant to both rules. The Court addresses each in turn.

## A. Rule 12(b)(1) Subject Matter Jurisdiction

Article III, section 2 of the United States Constitution "limits the 'judicial power' to the resolution of 'cases' and 'controversies.'" *Valley Forge Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). A necessary element of Article III's case-or-controversy requirement is "that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Id.* "[T]he irreducible constitutional minimum of standing contains three elements." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A party must have personally suffered an injury in fact, which is fairly traceable to the defendant's challenged conduct, and which is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. The party invoking federal jurisdiction bears the burden of establishing each of these elements. *Id.* at 561.

Here, Defendants launch a facial attack on jurisdiction and argue that Plaintiffs lack standing because (1) they have not alleged that they have suffered an injury in fact, and (2) their claims are unripe. Neither argument is persuasive.

As the Seventh Circuit has noted, "the Article III standing requirements are rather undemanding." *Family & Children's Ctr., Inc. v. Sch. City of Mishawka*, 13 F.3d 1052, 1058 (7th Cir. 1994). The first prong requires that an injury be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. "The magnitude, as distinct from the directness, of the injury is not critical to the concerns that underlie the requirement of standing." *Am. Bottom Conservatory v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011). Indeed, the injury in fact necessary for standing "need not be large, an identifiable trifle will suffice." *Sierra Club v. Franklin Cnty. Power*, 546 F.3d 918, 925 (7th Cir.

2008) (internal quotations omitted).  Additionally, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Plaintiffs have satisfied this low burden.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Here, Plaintiffs McDaniel and Ross, on behalf of their children who are enrolled in special education programs, allege that the school closings will thrust their children into unfamiliar peer groups, disturb established relationships with teachers and service providers, place their children in larger classes, and leave their children's IEPs unrevised and unmet, all resulting in significant academic and emotional setbacks. (Compl. ¶¶ 28-30, 33-34, 43, 76-78.)  They also assert that Defendants' failure to create school-specific safety plans endangers their children because they will be forced to walk through unfamiliar and dangerous neighborhoods to get to their new schools and, as children with special needs, they are more vulnerable to dangers and safety threats.  (*Id.* ¶¶ 57-59, 62-63, 70, 122.)  Finally, Plaintiffs McDaniel and Ross claim that Defendants closed "underutilized" schools using criteria that resulted in a decision to close a disproportionately high number of schools that offer special education programs.  (*Id.* ¶¶ 83-89.)  At the motion to dismiss stage, these alleged harms satisfy Article III's injury in fact requirement.

Nevertheless, Defendants counter that Plaintiffs' claims of injury are too speculative.  They argue that Plaintiffs' assertions of injury are based upon sheer speculation and fears about

6

the future and not specific articulable conditions. But an injury in fact need not be certain; it is enough "so long as there is some nonnegligible, nontheorectical probability of harm that [Plaintiffs'] suit if successful would redress." *See MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 744 (7th Cir. 2007); *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991) ("[A] probabilistic benefit from winning a suit is enough 'injury in fact' . . . to confer standing in the undemanding Article III sense.") (internal citations omitted). What is more, "a case is not dismissed for failure to invoke federal jurisdiction just because the plaintiff fails to prove injury. Ordinarily . . . the allegation is enough." *MainStreet*, 505 F.3d at 745. Thus, Plaintiffs' allegations are sufficient to confer Article III standing at this preliminary stage.

Defendants also argue that Plaintiffs' ADA claims are not ripe for adjudication because Plaintiffs have not availed themselves of the administrative remedies available under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400. The IDEA requires participating States, including Illinois, to provide "all children with disabilities . . . [with] a free appropriate public education." § 1400(d)(1)(A); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005). The IDEA contains detailed procedural safeguards that provide parents of children with disabilities "an opportunity to present complaints with respect to any matter relating to the . . . provision of a free appropriate public education to such child," including the adequacy of an IEP. *See* 20 U.S.C. §1415; *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 486 (7th Cir. 2012) ("Once an IEP is in place, the school must provide the services listed in it, and the IDEA sets out many rules governing the process of amending an IEP.") Under these procedures, before bringing a case in federal court, a parent must exhaust the IDEA's administrative remedies. 20 U.S.C. § 1415(*l*); *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist.*, 98 F.3d 989, 991 (7th Cir. 1991).

Additionally, under what has been characterized as an "unusual provision" in the IDEA, "any pupil who wants 'relief that is available' under the IDEA must use the IDEA's administrative system, even if he invokes a different statute."[1] *Charlie F.*, 98 F.3d at 991 (requiring plaintiffs to exhaust the IDEA's administrative remedies even though they brought claims under only the ADA, the Rehabilitation Act, 29 U.S.C. § 794, and the Constitution of the United States (through 42 U.S.C. § 1983)). Furthermore, "[t]he [IDEA] speaks of available relief, and what relief is 'available' does not necessarily depend on what the aggrieved party wants." *Id.* at 991. Instead, courts must look to the "theory behind the grievance" to see if the IDEA's process is triggered. *Id.* at 991-92 ("The nature of the claim and the governing law determine the relief no matter what the plaintiff demands.") Indeed, "[b]y making an unreasonable or unattainable demand parents cannot opt out of the IDEA." *Id.* Thus, if the IDEA can provide Plaintiffs relief, they must exhaust the IDEA's administrative process before coming to federal court, even though they bring claims under only the ADA.

According to Defendants, Plaintiffs' claims must be dismissed because they have not pursued the administrative remedies under the IDEA. Plaintiffs respond that exhaustion is not necessary here. The Court, however, need not decide this issue for the purposes of this motion because failure to exhaust under the IDEA is not a matter of jurisdiction, but an affirmative defense that cannot form the basis of a motion to dismiss under Rule 12(b)(1). *Mosely v. Bd. of Educ. of City of Chi.*, 434 F.3d 527, 533 (7th Cir. 2006) ("A failure to exhaust is normally considered to be an affirmative defense . . . and we see no reason to treat it differently here

---

[1] The IDEA's "unusual provision" reads: "Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 *et seq.*], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter." 20 U.S.C. § 1415(*l*).

[under the IDEA]") (internal citations omitted).[2] As such, a failure-to-exhaust argument is one that the Court normally considers, at the earliest, after an answer has been filed, not at the motion to dismiss stage. *See id.* Thus, Defendants' second argument also fails, and the motion to dismiss pursuant to Rule 12(b)(1) is denied.

### B. Stating a Claim under Rule 12(b)(6)

Defendants also argue that under Rule 12(b)(6), Plaintiffs have failed to state claims of either disparate impact discrimination or failure to reasonably accommodate under the ADA. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 does not require "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Here, Plaintiffs have satisfied Rule 8.

A Title II ADA claim can be based on one of three theories: (1) intentional discrimination on the basis of a disability, (2) disproportionate impact on disabled people, or (3) a refusal to reasonably accommodate disabled people. *See Wis. Cmty. Servs., Inc. v. City of*

---

[2] Other circuits are split on whether IDEA exhaustion is jurisdictional. *Compare Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002) ("A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction."), *and MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002) ("The failure of the [plaintiffs] to exhaust their administrative remedies for [certain IDEA-related claims] deprives us of subject matter jurisdiction over those claims"), *with Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867 (9th Cir. 2011) (holding that "the IDEA's exhaustion requirement is a claims processing provision that IDEA defendants may offer as an affirmative defense").

*Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (en banc).  Plaintiffs bring claims under the second and third theories – disparate impact and failure to accommodate.

Disparate impact claims are cognizable under the ADA.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003).  Disparate impact discrimination occurs when an entity adopts a policy or practice that is "facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity." *Id.*  Here, Plaintiffs McDaniel and Ross allege that Defendants' policy of closing the schools will cause their children disproportionately more harm than general education students because their children are more vulnerable than their non-disabled peers to suffering academic and emotional setbacks when they lose their peer groups, strong teacher relationships, and smaller class sizes. (Compl. ¶¶ 34, 43.)  Plaintiffs McDaniel and Ross also contend that Defendants' policy of school closings will disproportionately harm their children because the closings will deprive them of adequate IEPs and other services that only special education students receive.  (*Id.* ¶¶ 76-78.) Finally, Plaintiffs McDaniel and Ross assert that the criteria Defendants' used to identify schools for closure disproportionately impacted schools with special education programs.  (*Id.* ¶¶ 83-89.) These allegations satisfy the liberal pleading standard of Rule 8.

Plaintiffs also allege that carrying out the school closings within a short period of time fails to reasonably accommodate their children.  Failure to make a reasonable accommodation is an independent basis for a Title II claim.  *Wisc. Comm'n Servs., Inc.*, 465 F.3d at 753 ("Plaintiffs need not allege either disparate treatment of disparate impact in order to state a reasonable accommodation claim under Title II of the ADA."); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999).  Plaintiffs' allegations that Defendants have failed to ensure that their children's IEPs will be satisfactorily implemented in the new schools and that

their children will suffer disproportionate academic and emotional setbacks as a result of the school closures also satisfies Rule 8 with respect to Plaintiffs' reasonable accommodation claim.

## II. Plaintiffs' ICRA Claims

In addition, Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' ICRA claim because it presents questions of state law that should be decided by state courts and, if the Court dismisses Plaintiffs ADA claims, no federal claims will remain. This argument is likewise unavailing.

The Court's jurisdiction over Plaintiffs ADA claims is based on the federal question statute, 28 U.S.C. § 1331, which grants federal district courts original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." The Court's jurisdiction over Plaintiffs' state law ICRA claims is based on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), which extends the jurisdiction of federal courts to all claims that are sufficiently related to the claim or claims on which their original jurisdiction is based and are part of the same case or controversy within the meaning of Article III of the Constitution. *See Wright v. Assoc. Ins. Cos., Inc.*, 29 F.3d 1244, 1250 (7th Cir. 1994).

Under the supplemental jurisdiction statute, federal courts may decline to exercise supplemental jurisdiction over a state law claim. 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, federal courts "should consider and weigh the factors of judicial economy, convenience, fairness and comity." *Wright*, 29 F.3d at 1251 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Here, these factors weigh in favor of the Court exercising supplement jurisdiction over Plaintiffs' ICRA claim. First, the Court has not dismissed Plaintiffs federal ADA claims, so the

"general rule" that a federal court should dismiss state law claims when all federal claims have been dismissed does not apply. *See Wright*, 39 F.3d at 1251.

Second, judicial economy and convenience both support exercising jurisdiction over Plaintiffs' ICRA claims. Plaintiffs' ADA claims are based, in part, on the theory that the criteria Defendants used to identify schools for closure resulted in the disproportionate closing of schools offering special education programs. (Compl. ¶¶ 83-89.) Plaintiffs' ICRA claims allege that, because of poverty and homelessness, a higher percentage of African American children are in special education programs, and, therefore, a higher percentage of African American children are harmed by Defendants' school closure criteria. (*Id.* ¶¶ 193-94.) The interconnectedness of Plaintiffs' ADA and ICRA claims favor the exercise of the Court's supplemental jurisdiction over the ICRA claim. There is no persuasive reason why another court should also be required to examine the same issues that are currently before this one. *See Rothman v. Emory Univ.*, 123 F.3d 446, 454 (7th Cir. 1997).

Third, no questions of fairness are implicated by the Court's exercise of jurisdiction over Plaintiffs' ICRA claim. Plaintiffs have the same opportunity to present their ICRA claim to the Court as they have their ADA claims. Similarly, Defendants have the opportunity to present their defense to Plaintiffs' ICRA claim as they have with respect to Plaintiffs' ADA claims. And, in any event, Defendants have presented no reason that a state court would be able to provide the parties will an opportunity to adjudicate their respective positions in a manner materially different from that provided here.

Finally, as to the issue of comity, Plaintiffs' ICRA claim does not ask the Court to address complex questions of state law. The ICRA "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon." *Jackson v. Cerpa*, 696 F.

Supp. 2d 962, 964 (N.D. Ill. 2010) (emphasis in original). Indeed, the ICRA was not intended "create any new rights. It merely created a new venue in which plaintiffs could pursue in State courts discrimination that had been available to them in federal courts." *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 368 Ill. App. 3d 321, 327 (1st Dist. 2006). The Court is familiar with federal disparate impact discrimination law, and there is no danger that its adjudication of the ICRA claim would improperly infringe upon the role of the Illinois state courts. For all of these reasons, the Court exercises its discretion to exercise supplemental jurisdiction over Plaintiffs' ICRA claim.

## **Conclusion**

For these reasons provided above, the Court denies Defendants' motion to dismiss [29].

**SO ORDERED**  ENTER: 7/25/13

_____
**JOHN Z. LEE**
**U.S. District Judge**