**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHERISE McDANIEL, on behalf of herself and her son, E.E., MARSHETTA ROSS, on behalf of herself and her son, M.R., , FRANCES NEWMAN and ALPHONSO NEWMAN, on behalf of themselves and their son, A.S., on behalf of themselves and all others similarly situated,** | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | **13 C 3624** |
| | ) | |
| | ) | **Judge John Z. Lee** |
| **Plaintiffs,** | ) | |
| **v.** | )<br>) | |
| **BOARD OF EDUCATION OF THE CITY OF CHICAGO, and BARBARA BYRD-BENNETT, Chief Executive Officer,** | )<br>)<br>) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Sherise McDaniel, Marshetta Ross, and Frances and Alphonso Newman (collectively "Plaintiffs") are parents whose children are enrolled in Chicago public schools. They have sued the Board of Education of the City of Chicago ("Board") and Barbara Byrd-Bennett, the Chief Executive Officer of the Chicago Public Schools ("CPS") (collectively "Defendants") on two counts related to the planned closure of forty-nine CPS elementary schools before the commencement of the 2013-2014 school year. In Count I, Plaintiffs McDaniel and Ross allege that Defendants will disproportionately harm students with disabilities and fail to reasonably accommodate these students by closing the schools using a selection process that violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. In Count II, all four Plaintiffs allege that Defendants used a selection process that discriminated against African-American students by requiring them to bear a disproportionate share of the burden

resulting from the school closings in violation of the Illinois Civil Rights Act ("ICRA"), 740 Ill. Comp. Stat. 23/5.

Plaintiffs request that the Court enjoin not only the closure of the schools their children attend – namely, Manierre and Calhoun elementary schools and Williams middle school – but also the closure of the other forty-six elementary schools approved by the Board. To accomplish this, Plaintiffs have filed a motion pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") to certify two classes, one consisting of the "parents of all minor students and all students who are currently in special education programs but attend general education or 'inclusion' classes with non-disabled students at one of the 49 elementary schools" (the "ADA Class"), and the other consisting of "all African-American students affected by the proposed closings – students in both the receiving schools and the 49 elementary schools that Defendants recommended for closure" (the "ICRA Class"). Plaintiffs, however, have failed to establish, as they must, that the members of the proposed classes would suffer a common class-wide injury as a result of the closings. For example, Plaintiffs' own expert testified that a significant portion of students may actually benefit academically, rather than be harmed, from the closings over time. Similarly, although Plaintiffs allege that all disabled students and African-American students will face a disproportionate degree of risk to their safety when walking through unfamiliar neighborhoods to their new schools, two of the named Plaintiffs' children will not be changing school buildings next year, and the parents of the third child have no safety concerns because the new school is just three blocks from their home. Moreover, the creation, revision, and implementation of a Individualized Education Program ("IEPs") for a student in a special education program is a highly individualized process that is entirely dependent upon the specific needs of the student and his or her unique academic and social surroundings. For these and the other reasons

discussed below, Plaintiffs have failed to satisfy the commonality, typicality, and adequacy of representation requirements of Rule 23(a). Plaintiffs have also fallen short of establishing the appropriateness of class-wide injunctive relief under Rule 23(b)(2). Accordingly, Plaintiffs' motion for class certification is denied.

## Background[1]

On May 22, 2013, the Board approved the closing of 49 elementary schools. (Pls.' Mem. Class Cert. 2.) Each of the students at the 49 closing schools has been assigned to one of 52 receiving schools. (Defs.' Resp. 1.)

## I.      Plaintiff McDaniel and Her Son "E.E."

Plaintiff Sherise McDaniel's son, E.E., is African-American. (Defs.' Resp., Ex. G, Dep. of Sherise McDaniel 7-8.) During the 2012-2013 school year, E.E. attended George Manierre Elementary School. (*Id.* 9.) Manierre is not scheduled to close at the end of the 2012-2013 school year, and E.E. will continue to attend Manierre for the 2013-2014 school year. (*Id.* 22.)

E.E. receives special education services pursuant to an IEP. (*Id.* 10.) Specifically, E.E. receives speech therapy once a week for forty-five minutes. (*Id.*) McDaniel believes that E.E.'s IEP is meeting his needs now and will meet his needs for the upcoming school year. (PI Tr.

---

[1]      The facts cited herein are taken from Plaintiffs' Complaint as well as the parties' briefs supporting and opposing class certification and the accompanying exhibits. Furthermore, during the briefing period and prior to Plaintiffs' submission of their reply brief, the Court conducted a four-day evidentiary hearing to assist the Court in deciding Plaintiffs' motion for preliminary injunction. Testimony and documents introduced at the hearing are also cited in this opinion to the extent that they relate to class certification issues. *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (stating that "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits") (citing *Szabo v. Bridgeport Machs. Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Testimony presented at the hearing will be cited by transcript page number as "PI Tr. [   ];" exhibits admitted at the hearing will be referred to as "PI Ex. [   ];" deposition designations offered by the parties as part of the preliminary injunction hearing will be referred to as "PI Dep. of [   ]."

388.)  Because E.E.'s school is not closing, McDaniel does not think E.E. will be harmed in any way by Defendants' closing of 49 elementary schools.  (Defs.' Resp., Ex. G, Dep. of Sherise McDaniel  31.)

## II.    Plaintiff Ross and Her Son "M.R."

Plaintiff Marshetta Ross' son, M.R., is African-American.  (Defs.' Resp., Ex. H, Dep. of Marshetta Ross 9.)  During the 2012-2013 school year, M.R. attended John Calhoun North Elementary School.  (*Id.* 12.)  Calhoun is scheduled to close at the end of the 2012-2013 school year.  (*Id.* 23-24.)

M.R. has cerebral palsy and receives special education services pursuant to an IEP.  (*Id.* 16, 22.)  Specifically, M.R. receives speech therapy and physical therapy.  (*Id.* 16.)  Calhoun's designated receiving school is Willa Cather Elementary School, but Ross decided to enroll M.R. at Michael Faraday Elementary School.  (*Id.* 41-42.)  Ross believes that all students in receiving and closing schools are going to be harmed by the school closings because of gang and "territorial" issues, but she is unsure whether M.R. in particular will be harmed by gang issues at Faraday.  (*Id.* 111-13.)  Ross, however, is not worried about M.R.'s safety on his new route to Faraday, which is only three blocks from Ross' house.  (*Id.* 119-20.)  She is concerned that M.R. might walk past high school students smoking cigarettes and hugging and kissing each other on the way to Faraday.  (*Id.* 117.)  She also has general concerns about changing from one school to another and believes that "[a]ny type of change is harmful to anybody."  (*Id.* 120-21.)

Ross testified that she is seeking to serve as a class representative for "[e]veryone that's being affected by the school closings," including African-Americans, Hispanics, "minority class people," staff, administrators, teachers, cafeteria workers, and janitors.  (*Id.* 61-62.)  She is seeking to stop all school closings, but would accept a resolution wherein only Calhoun was kept

4

open because she does not know anything about the other schools.  (*Id.* 66.)  She also believes that all low-performing schools, characterized as "Level 3" schools in CPS, should be closed.  (*Id.* 33, 106-07.)

### III.    Plaintiffs Frances and Alphonso Newman and Their Daughter "A.S."

Plaintiff Frances Newman's daughter, A.S., is African-American.  (Defs.' Resp., Ex. H, Dep. of Frances Newman 8-9.)  During the 2012-2013 school year, A.S. attended Williams Preparatory Academy Middle School.  (*Id.* 14.)  Williams is an open enrollment school, meaning that students are not required to live in a certain attendance boundary to attend.  (*Id.*)  A.S.'s neighborhood school is Mahalia Jackson Elementary School, but Newman chose to enroll A.S. in Williams because she was impressed with its curriculum.  (*Id.* 47.)  Williams is located at 2017 South Dearborn Street, approximately eight miles from A.S.'s residence.  (*Id.* 14.)  Newman usually drives A.S. to school, or sometimes A.S. takes a CTA bus.  (*Id.* 15.)

The designated receiving school for Williams is John B. Drake Elementary School.  (*Id.* 26.)  Drake is currently located at 2722 South King Drive, approximately three blocks from Williams.  (*Id.* 44.)  As part of the approved school actions, Drake will be relocating to the Williams building at 2017 South Dearborn Street beginning in the 2013-2014 school year.  (*Id.* 44-45.)  Thus, all students who attended Williams during the 2012-2013 school year will remain in the same building during the 2013-2014 school year.  (*Id.*)

A.S. is currently enrolled at Drake for the 2013-2014 school year, but Newman is unsure whether she will actually attend Drake.  (*Id.* 49-50.)  She is waiting to see how many of A.S.'s teachers and peers will be at Drake before making her final decision.  (*Id.* 49-50.)  Newman sees the possibility of having the same teachers and peers in her new school as a positive benefit for A.S.  (*Id.* 48-49.)  She has no reason to believe that the quality of the teaching staff is any worse

at Drake than it is at Williams.  (*Id.* 50.)  She believes that A.S. will be harmed by the closing of

Williams "[b]ecause her stability is being taken away."  (*Id.* 57.)  She is also concerned that A.S.

will not have the same teachers at her new school.  (*Id.* 57.)  She has no safety concerns about

A.S. attending Drake.  (*Id.* 61-62.)

## IV.  Plaintiffs' ADA Claims and the Proposed ADA Class

In their Complaint, McDaniel and Ross allege that the school closures will destroy their

children's existing relationships with teachers, administrators, and peers.  (Compl. ¶ 25.)  They

also allege that the closures will result in their children being placed in larger classes with longer,

unfamiliar, and dangerous commutes to and from school. (*Id.* ¶¶ 58-59.)  They contend that the

academic and emotional setbacks resulting from these harms will be especially pronounced in

their children because their children are enrolled in special education programs.  (*Id.* ¶¶ 28-30,

34, 57, 62-63, 70, 122.)  They further allege that the short time period between the Board's

approval of the school closings and the commencement of the 2013-2014 school year prevents

them from revising their children's IEPs.  (*Id.* ¶¶ 76-78.)  Finally, they contend that, when

identifying schools for closure, Defendants employed criteria that resulted in the disproportionate

closure of schools with special education classes.  (*Id.* ¶¶ 83-89.)  They seek to assert their

claims as a class on behalf of:

> The parents of all minor students and all students who are currently in special
> education programs but attend general education or "inclusion" classes with non-
> disabled students at one of the 49 elementary schools that Defendants
> recommended for closure and which the Defendant Board of Education voted to
> close on May 22, 2013.

(Pls.' Mem. Class Cert. 2.)

## V.  Plaintiffs' ICRA Claims and the Proposed ICRA Class

All four Plaintiffs allege that African-American children will disproportionately suffer the "generally acknowledged negative impacts of the school closings."  According to Plaintiffs, the criteria Defendants used to identify schools for closure resulted in the disproportionate closure of schools with special education programs.  Because a higher percentage of African-American children are in special education, at least as alleged by Plaintiffs, African-American children also will be disproportionately harmed.  (Compl. ¶¶ 144, 193-94.)  Plaintiffs also argue that based on standardized test performance, at least one-third of the schools set to close outperformed the schools to which students will be transferred.  (*Id.* ¶ 203.)  Plaintiffs seek to assert their claims as a class on behalf of:

> All African-American students affected by the proposed closings – including students in both the receiving schools and the 49 elementary schools that Defendants recommended for closure and which the Defendant Board of Education voted to close on May 22, 2013.

(Pls.' Mem. Class Cert. 2.)

### Discussion

Plaintiffs seek to certify the ADA class and ICRA class  under Rule 23.  "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal citations and quotations omitted).  In order to justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal citations and quotations omitted).

To be certified, a proposed class first must meet each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).  Once Rule 23(a) is satisfied, the proposed class must fall within one of the three categories enumerated in

Rule 23(b): "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because the risk that the class action adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 131 S. Ct. at 2551. "On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, the named plaintiff bears the burden of showing that a proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence. *Id.* "Failure to meet any one of the requirements of Rule 23 precludes certification of a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (internal citations and quotations omitted). Moreover, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 131 S. Ct. at 2551 (internal citations and quotations omitted).

Finally, although "as a general principle, a court is not allowed to engage in analysis of the merits in order to determine whether a class action may be maintained [,] . . . the boundary between a class determination and the merits may not always be easily discernible." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598-99 (7th Cir. 1993) (internal citations and quotations omitted). Consequently, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.*; *see also Dukes*, 131 S. Ct. at 2551 (class certification analysis "[f]requently . . . will entail some overlap

with the merits of the plaintiff's underlying claim"). As noted, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda*, 600 F.3d at 815; *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889-90 & n.6 (7th Cir. 2011).

Here, Plaintiffs contend that each of the proposed classes satisfies all four requirements of Rule 23(a) and the requirements of Rule 23(b)(2). In response, Defendants argue that the proposed classes fail to satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements, as well as Rule 23(b)(2). The Court will address each issue in turn.

## I. Rule 23(a)(2): Commonality

To demonstrate commonality under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "It's true that '[e]ven a single [common] question' will do." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Dukes*, 131 S. Ct. at 2556). "But the Supreme Court explained in [*Dukes*] that superficial common questions – like whether each class member is [a public school student] or whether each class member 'suffered a violation of the same provision of law' – are not enough." *Id.* (quoting *Dukes*, 131 S. Ct. at 2551). Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The class "claims must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs argue that Rule 23(a)(2)'s commonality requirement is satisfied as to both classes because Defendants used the same criteria to select the forty-nine schools for closure and are implementing the closures pursuant to a uniform policy. (Pls.' Mem. Class Cert. 7-8; Pls.' Reply 1.) But, as Plaintiffs themselves recognize, even if these allegations were true, they alone would not be sufficient. (Pls.' Mem. Class Cert. 7-8.) Under *Dukes*, Plaintiffs also must establish that, as a result of these criteria and policies, the members of the putative class have suffered "the same injury." Plaintiffs have failed to make this showing.

## A.      ADA Class

Plaintiffs contend that putative ADA class members will be harmed in the same manner because "Plaintiffs' rights under the ADA, including the right to accommodation, have been violated by Defendants' actions." (Pls.' Mem. Class Cert. 8.) In their papers, Plaintiffs identify three types of harm that the putative class purportedly will suffer as a result of the closures. First, Plaintiffs claim that the closures will harm students with disabilities on a class-wide basis with respect to the review, revision, and implementation of their IEPs. Second, Plaintiffs claim that "students at both closing and receiving schools are likely to face academic setbacks" as a result of the closings. (Pls.' Mem. Class Cert. 8.) Third, Plaintiffs claim that the putative class members will face "increased safety issues." (*Id.*) Aside from these particular harms, Plaintiffs also assert that the Board's use of a system-wide utilization formula to select the closing schools resulted in harm to the class and, therefore, satisfies the commonality requirement of Rule 23(a)(2). Each will be discussed in turn.

### 1.      Adequacy of IEPs

As for the IEPs, Plaintiffs appear to offer a number of different theories as to what harm will be suffered by the putative class as it relates to their IEPs. Plaintiffs first contend that CPS's

schedule to effectuate the closings does not provide sufficient time for the IEPs to be reviewed, revised, and implemented. (Compl. ¶ 78.) Then Plaintiffs argue that the Board's policy of granting discretion to the staff at the receiving schools to review and revise the IEPs violates the ADA. (Pls.' Mem. Class Cert. 5.) Then, in their reply brief, Plaintiffs inexplicably state that "[t]his case is not about whether or to what extent a transition will require a modification of the students' IEP or additional accommodations, but whether these students, as a group, have been discriminated against on a basis which is legally barred." (Pls.' Reply 5.)

As for this last proposition, the Supreme Court has already declared in *Dukes* that such assertions of generalized legal injury are insufficient to satisfy commonality under Rule 23(a)(2). *Dukes*, 131 S. Ct. at 2556. Plaintiffs' statement that "[i]n particular, Defendants violate the ADA by placing the plaintiff children and other children in special education at greater risk than their non-disabled peers and failing to accommodate the needs of these students" (Pls.' Reply 5) is equally uninformative. As such, Plaintiff's latest effort to recast their claims of injury in this manner to suit the "commonality" requirement is unavailing.

As for the first two articulations of harm, they are both grounded in the premise that the school closures and resulting transitions will require some, if not all, of the IEPs of the putative class members to be changed. After all, if this were not the case and we assume that the IEPs are sufficient as they stand today, the putative class members would suffer no harm as it relates to their IEPs. In fact, as evident from the Complaint and Plaintiffs' preliminary injunction briefs, the crux of Plaintiffs' theory is that the IEPs of disabled students are deficient, do not provide the supports necessary for the students' transition, and will not be adequately revised or implemented at the receiving schools. (Compl. ¶ 78; Pls.' Post-Hearing Br. in Support of a Prelim. Inj. 8 (arguing that "there are no adequate IEPs, with measurable goals, no supports in

those IEPs for the transition of these children"), 11 (quoting Plaintiffs' expert, Lucy Witte, as stating, "The transition is much too fast to ensure proper and successful implementation of IEPs and be compliant with the federal regulations of IDEA.").) As their title suggests, however, IEPs – Individualized Education Programs – are "highly individualized," *Jamie S.*, 668 F.3d at 486, and Plaintiffs have failed to show that the school closings will render the IEPs of putative class members inadequate on a class-wide basis.

Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, states, including Illinois, that receive federal funding for the education of disabled children must provide "each child with a disability" with a "written statement," known as an IEP. The IEP details the child's academic and functional goals, performance, and progress, and outlines the special education and related services the child needs. 20 U.S.C. § 1414(d)(1); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181-82 (1982); *Jamie S.*, 668 F.3d at 485. IEPs are "tailored to each student's specific needs" and are "highly individualized because every child is unique." *Jamie S.*, 668 F.3d at 485. A child's IEP is "developed, reviewed, and revised" by an "IEP team" composed of the child's parents, regular education teachers (if the child participates in regular education), special education teachers, related service providers (e.g., speech therapists, psychologists, and social workers), school administrators, and other relevant individuals. 20 U.S.C. § 1414(d)(1)(B).

The IEP team must review the IEP annually and, as appropriate, revise it. *Id.* § 1414(d)(1)(B)(4). If, at any time between annual meetings, an IEP team member, including a parent, wishes to revise the IEP, that team member can request an IEP team meeting; the IDEA sets forth detailed procedures governing the IEP revision process. *See* 20 U.S.C. § 1415; 34 C.F.R. §§ 300.320-324; 23 Ill. Adm. Code § 226.220(b); *Jamie S.*, 668 F.3d at 486 ("Once an

IEP is in place, the school must provide the services listed in it, and the IDEA sets out many rules governing the process of amending an IEP.") Within CPS, the school must respond to a parent's request for an IEP team meeting within ten days. (PI Tr. 827.)

As these detailed procedures demonstrate, complying with the IDEA is a "complex and inherently child-specific undertaking." *Jamie S.*, 668 F.3d at 486. Indeed, the IDEA's purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services *designed to meet their unique needs* . . ." 20 U.S.C. § 1400(d)(1)(A) (emphasis added); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004) ("A 'one size fits all' approach to special education will not be countenanced by the IDEA.").

Here, the special education needs of the named Plaintiffs and putative class members are unique, and their IEPs differ as to whether and to what extent a transition to a new school will require a modification to the IEP, if at all. The more than 2,000 students with disabilities who will be affected by the closings all experience different types and degrees of disability, falling within multiple different disability classifications, including "AU" (autism), "DD" (developmental delay), "SLP" (speech and language), and "EBD" (emotional behavior disturbed). (PI Ex DX24 at 25; PI Tr. 425, 786.)[2] *See* 34 C.F.R. §300.8 (defining a "child with a disability" as a child diagnosed with one of thirteen different conditions). This individual variation is evident from the IEPs of the named Plaintiffs' children in this case. E.E. receives speech therapy once a week for forty-five minutes (Defs.' Resp., Ex. G at 10), while M.R., who suffers from cerebral palsy, receives both physical and speech therapy. (*Id.*, Ex. H at 16, 22.)

---

[2]     CPS estimated that 2,459 students would be impacted by the closure of the 54 schools that were originally recommended for closure to the Board. Because the Board approved the closure of only 49 schools, the actual number will be slightly less. (PI Tr. 778.)

Furthermore, approximately 50% of disabled students in the closing schools participate in general education classrooms for 80% or more of their school day. (PI Tr. 782; PI Ex Dx 24 at 21-22.) Another 25% of disabled students participate in general education classrooms from 79% to 40% of their school day. (PI Tr. 778, 782.) And approximately 450 of the impacted disabled students are enrolled in cluster programs and spend nearly 100% of their day in special education classes. (*Id.*) The needs of these students as they go about their school day are entirely different. Similarly, although some students with disabilities may qualify for transportation services, others, like E.E., do not require any transportation services at all. (PI Ex. Px 92 C at 12.)[3] Given the different types and severity of disabilities experienced by the putative ADA class members, Plaintiffs fail to show that the IEPs of all putative ADA class members will be become inadequate as a result of the school closings so that they would require review and revision.

The need for individualized inquiry as to the adequacy of a student's IEP post-closure was confirmed by Doctor Markay Winston, the Board's Chief Officer for the Office of Diverse Learner Supports and Services and an expert on issues relating to the impact of the school closings on students with disabilities. (PI Tr. 415-16, 421.) Winston testified that students with disabilities cannot be "overgeneralized," and that it is not possible to say that "students with disabilities in general are going to struggle [with transition to new schools.]" (*Id.* 438, 461.) Winston recognized that some students with a particular disability, like autism, might struggle more than other students with different disabilities, but she noted that even some autism students might not struggle because it is not possible to "generalize based upon a disability label or disability category which children may or may not require transition supports." (*Id.* 426.) Consequently, Winston testified that an IEP team need not meet just because a school is closing.

---

[3] By contrast, I.O, and C.B., who are students with disabilities and named Plaintiffs in the *Swan* case, receive transportation services to and from their schools. (PI Ex. Px 92A at 31; 92B at 28; 92E at 27.)

(*Id.* 464, 467-68, 499-500.) In short, simply knowing that a child has an IEP reveals little about what is educationally appropriate for that child and whether and how a child will be impacted when transitioning from one school to another.

For their part, Plaintiffs offered Lucy Witte, the Executive Director of Special Education at West Central Joint Services Special Education Cooperative, a cooperative of nine school districts in the Indianapolis area, as an expert in special education and the educational impact on disabled students who are moved from one school to another. Witte is cited for the proposition that "[a]s a class, this group of students [i.e., the disabled students at the closing schools] will experience special difficulties compared to non-disabled students." (Pls.' Mem. Class Cert. 10.) In reaching this conclusion, Witte reviewed the IEPs of I.O., V.B., and C.B., children of the named Plaintiffs in the *Swan* case, and concluded that they were inadequate because they did not include transition reports and behavior intervention plans. (PI Tr. 111, 122, 124-37.) But Witte did not review the IEPs of the class representatives in this case and failed to provide any evidence as to how the three IEPs in the *Swan* case are representative of the more than 2,000 at issue here. (*Id.* 155-56.) *See Jamie S.*, 668 F.3d at 486; *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013) (affirming decertification of a class where plaintiffs failed to provide evidence that their selected representatives were, in fact, representative of the entire class). In fact, they are not; for example, I.O. suffers from autism, while E.E. has a speech impediment. Furthermore, upon cross-examination, Witte acknowledged that the inadequacies that she observed in the IEPs of the *Swan* children would have existed regardless of whether the children's schools were closed (PI Tr. 156) and, therefore, were not caused by the closures themselves.[4] Accordingly, Witte's testimony does not provide the Court with persuasive

---

[4] Additionally, Witte acknowledged that she had not reviewed the depositions of the parents in the *Swan* case and was not aware that I.O.'s and V.B.'s parents had testified that their children's

evidence that the Board's decision to close the schools or the closures themselves would result in inadequate IEPs that would cause class-wide harm to the entire ADA Class.

Along similar lines, Plaintiffs also argue based upon Witte's testimony that the current schedule for the school closings does not provide enough time to make the necessary revisions to students IEPs. However, the question of whether a parent has had or will have an opportunity to request an IEP meeting in advance of the transfer also necessitates individualized inquiry. As CPS's Director of Student Supports, Rebecca Clark, testified, CPS has allocated funding for IEP team meetings for those parents who request such meetings, and IEP team meetings are taking place throughout the summer. (PI Tr. 792, 827, 866.) CPS has also called all parents of students with IEPs who attended closing schools to ask if the parents had any concerns about the implementation of their child's IEP at the receiving school. (*Id.* 814-15.) And CPS has held meetings where parents could express their concerns about the closings and talk with receiving school staff about their child's IEP. (*Id.* 791, 809.) It is apparent from the evidence, which is largely uncontested, that parents could have requested IEP meetings for their children during the summer, and some in fact did so and have already participated in such meetings. Therefore, Plaintiffs have failed to establish, on a class-wide basis, that the current schedule provides insufficient time for the putative class members to have their IEPs revised for their new school environment.

Plaintiffs attempt to sidestep these individual factors by arguing that "Defendant Board's policy to allow receiving schools to make the decision of whether to review the IEPs is therefore a violation of the ADA." (Pls.' Reply 5; *see* Pls.' Mem, Class Cert. 4.) But this argument is also

---

current IEPs were meeting their needs, nor was she aware that CPS had reviewed the IEPs of all of the potentially impacted students in planning the closures, as CPS's Director of Student Supports in the Office of Diverse Learners Supports and Services, Rebecca Clark, would later testify. (PI Tr. 158-59, 778.)

unpersuasive. Not only do Plaintiffs fail to offer any legal authority for this proposition, but similar efforts to circumvent the common injury rule by arguing that "the policy is there is no policy" were specifically rejected in *Dukes*. *Dukes*, 131 S. Ct. at 2554 ("On its face, of course, [a policy of allowing discretion by local supervisors over employment matters] is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices.").

For these reasons, Plaintiffs have failed to demonstrate by a preponderance of the evidence that putative class members will experience inadequate IEPs or that the IEPs would have to be revised on a class-wide basis due to the school closings. Without that, Plaintiffs cannot satisfy Rule 23(a)(2)'s commonality requirement as to this claimed injury. *See Falcon*, 457 U.S. at 157; *Jamie S.*, 668 F.3d at 497 (vacating the certification of an IDEA class under Rule 23(a)(2) because, although the question "Did [Milwaukee Public Schools] fulfill its IDEA obligations to each child?" was common, "it must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation.").[5]

## 2. Academic and Emotional Harm

Plaintiffs also allege that they and the other putative class members will be harmed academically because of the school closures. But Plaintiffs' own expert acknowledged that a

---

[5] This is not to suggest that a class could never be certified where plaintiffs allege a violation of the IDEA that renders students' IEPs inadequate on a class-wide basis. *See Jamie S.*, 668 F.3d at 498 (acknowledging that a class could be certified if plaintiffs presented "significant proof" that a school district operated under "*policies* that violated the IDEA") (emphasis in original). If, for example, a school district refused to draft IEPs at all or adopted a blanket policy of refusing to provide parents with IEP team meetings upon request, plaintiffs could point to policies that violated the IDEA in ways that resulted in students suffering the same harm. Here, however, closing a school is not a "polic[y] that violate[s] the IDEA," and, as discussed, Plaintiffs have failed to establish that a school closing automatically renders an IEP inadequate.

significant number of putative class members may *benefit* academically from the school closings. Dr. Pauline Lipman, a professor of educational policy studies at the University of Illinois at Chicago, identified two studies on the impact of school closings on children's academic achievement: a 2009 study by the Consortium on Chicago School Research ("CCSR Study"),[6] and a 2012 study conducted by the RAND Corporation ("RAND Study").[7] (PI Tr. 5, 7, 9-11.) The CCSR Study found no long term impacts, either positive or negative, on academic achievement for most students as a result of school closings. (CCSR Study 14-15.) The study, however, did find a positive effect for students who were transferred to higher performing schools. (*Id.* 14-15.) Similarly, the RAND Study found that students displaced from schools could experience negative effects on achievement, but those effects could be offset if students moved to schools with higher performance. (*Id.* 17-18, 31.) The RAND Study also cautioned that it should not be interpreted too broadly because it studied only one school district. (*Id.* 31.)

Based on these studies and her review of the relevant documents in this case, Lipman concluded that "7 moves [from closing schools to receiving schools] – or just 12.5% – are to schools in the *top quartile of performance* . . . where significant academic gains can be predicted." (Pls.' Mem. Class Cert., Ex. 5 at 4) (emphasis in original). Lipman reiterated her conclusions at the preliminary injunction hearing, testifying that "12.5 percent [of students from closing schools] were sent to the top quartile schools, where we could expect . . . academic improvement, which means that 87 percent we could expect no improvement, or no difference." (PI Tr. 28.) Although the CCSR and Rand Study did not consider students with disabilities

---

[6]   *See* Marisa de la Torre & Julia Gwynne, *When Schools Close: Effects on Displaced Students in Chicago Public Schools*, Chicago: Consortium on Chicago School Research (Oct. 2009) (Defs.' Resp., Ex. D).

[7]   *See* John Engberg, Brian Gill, Gema Zamarro, & Ron Zimmer, *Closing Schools in a Shrinking District: Do Student Outcomes Depend on Which Schools are Closed?*, 71 J. URBAN. ECON. 189 (2012).

specifically, Lipman's testimony calls into question Plaintiffs' contention that putative class members will suffer academic harm on a class-wide basis. Indeed, it seems likely that a substantial number of students, particularly those transferred to higher performing schools, may actually benefit post-closure.[8]

Plaintiffs also allege that they and the other putative class members will be harmed emotionally by the school closures. Plaintiffs' expert, Witte, states that "[s]tudents with disabilities are particularly more vulnerable to transitions." (Pls.' Mem. Class Cert., Ex. 3 at 5.) For support, she notes that "[o]f the 2,459 students with disabilities being displaced from their home school, 63% (1553) experience low self esteem, mental health issues, social and emotional concerns, and cognitive impairments." (*Id.*) Similarly, Witte testified at the preliminary injunction hearing that the closures would cause students with disabilities "emotional or physical harm of being displaced" because the students "have issues of low self-esteem because they don't behave . . . like their nondisabled peers." (PI Tr. 156.) But to reach this conclusion, she relied solely upon the classification of the students into broad disability categories such as "autism," "emotional disabilities," and "cognitive impairments." (*Id.* 155-56, 162-63.) If a student fell into one of those categories, she concluded that the student experienced low self-esteem, mental health issues, social and emotional concerns, and cognitive impairments. (*Id.* 161-63.) Although she is qualified to opine on school closures and the impact of such closures on students with disabilities generally, she is not a psychologist or psychiatrist by training, she did not evaluate, review, or confirm any of the disability classifications, and she did not review

---

[8]    Prior to the preliminary injunction hearing, Defendants filed a motion to bar the testimony of Dr. Lipman under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Dkt. 96.) The Court took the motion under advisement. (Dkt. 107.) At the preliminary injunction hearing, Defendants did not object to Dr. Lipman's qualification as an expert. (PI Tr. 9.) In any event, after considering Dr. Lipman's testimony, the Court now finds that Dr. Lipman is qualified to testify as to the impact of school closings on students who attend the closing schools. Accordingly, Defendants' motion as to Dr. Lipman (Dkt. 96) is denied.

any IEPs of the putative class members, other than those of the children in the *Swan* case, I.O,

V.B. and C.B. (*Id.* 155-56.) At the certification stage, however, the Court need not decide

whether Witte's conclusion is correct. The Court need only recognize that, by her own

admission, Witte's conclusion that putative class members have low self-esteem and hence will

suffer harm due to the closings pertains to only 63% of the students with disabilities from closing

schools. (*Id.* 163-64.) It is entirely unclear how Witte expects the other 27% of disabled

students, who presumably do not suffer from "low self-esteem" (or, for that matter, any of the

students with disabilities at the receiving schools), to fare with the transitions.[9] This fails to

provide the Court with evidence that putative class members will suffer emotional harm on a

class-wide basis.

As an additional matter, Plaintiffs have offered no evidence regarding the potential

impact of school closures on the academic and emotional state of students in the receiving

schools. Because Plaintiffs have failed to establish by a preponderance of the evidence that the

members of the putative ADA Class will suffer class-wide academic or emotional harm due to

the school closings, their claims as to those purported harms fail to satisfy Rule 23(a)(2)'s

commonality requirement. *See Spano*, 633 F.3d at 588 (noting that a claim "is not common if

the alleged conduct harmed some participants and helped others"); *Bieneman v. City of Chi.*, 864

---

[9]     Noting that the children of the named Plaintiffs "have significant cognitive deficits, lack of
communication skills, and the inability to negotiate social circumstances and therefore cannot protect
and/or defend themselves from gangs, bullying, and assaults," Witte extrapolates this condition to the
entire class, claiming that the closings would cause irreparable harm to students with disabilities.
(Pls.' Mem. Class Cert., Ex. 4 at 5.) But, neither Plaintiffs nor Witte explains why this extrapolation
is sound. Indeed, one of the named Plaintiff's own children, L.O., spends most of her day in general
education classes, and there is no indication that she lacks the skills to acclimate to her receiving
school.

F.2d 463, 465 (7th Cir. 1988) (affirming denial of class certification where some putative class members received a benefit while others experienced harm from the same conduct).[10]

### 3. Student Safety

In addition to the potential impacts on a student's IEPs and academic and emotional well-being, Plaintiffs allege that students with disabilities will disproportionately face safety risks due to the school closures because they will be required to walk through new and unfamiliar neighborhoods in dangerous areas of the city to their receiving schools. Plaintiffs also contend that Defendants have failed to create school-specific safety plans to ensure their safety. (Compl. ¶¶ 74-75, 77-78.) Again the preponderance of the evidence does not demonstrate that this injury will be experienced, if at all, on a class-wide basis.

First, not all putative class members who are changing schools will be required to walk alone through new and unfamiliar neighborhoods; many of them will be provided transportation services pursuant to their IEPs or based on the location of their receiving school. (PI Tr. 66.) Indeed, students who enroll in a receiving school that is greater than 0.8 mile from the closing school will receive transportation under CPS's transition plan. (PI Tr. 715.)

---

[10] Plaintiffs also cite to the expert report of Laurie Siegel to support their assertions of potential academic harms and risks to safety. (Pls.' Mem. Class Cert. 8; *id.,* Ex. 2.) Prior to the preliminary injunction hearing, however, Defendants filed a motion to bar her testimony pursuant to Fed. R. Evid. 702 and *Daubert.* (Dkt. 94.) This motion was granted in part, while the remainder was taken under advisement. (Dkt. 107.) During the preliminary injunction hearing, Defendants again challenged Siegel's qualifications to testify as to potential harms. As a result, Plaintiffs agreed to limit Siegel's testimony to her opinions that (1) there will be inadequate staffing at the receiving schools to handle the influx of transferring students with IEPs and (2) the lack of staffing will cause harm to the incoming students with disabilities. (PI Tr. 215-17; Dkt. 111.) The Court permitted Siegel to testify as to these limited topics. But Siegel's testimony fails to provide the Court with evidence that there will be inadequate staffing on a class-wide basis. Siegal admitted that the needs of students in special education programs depend on the individual student. (PI Tr. 248.) She also stated that she was not aware that no social workers had been laid off because of the school closings or that many, if not all, of the social workers from the closing schools will be transitioning to the receiving schools. (*Id.* 249.) In fact, Clark testified that clinical staff at the closing schools were not being laid off and instead will be reallocated to the receiving schools based upon a school's particular need. (PI Tr. 831.)

Second, not all students transitioning to receiving schools will be required to walk through dangerous neighborhoods to get to their new schools. For example, M.R.'s new school is only three blocks from his residence, and his mother, Ross, is not concerned about M.R.'s safety on his new route. (Defs.' Resp., Ex. H at 119-20.) Similarly, A.S.'s receiving school will be in the same building as her closing school; therefore, Newman does not have any safety concerns about her daughter traveling to and from school on a new route. (*Id.*, Ex. I at 15, 45.) Thus, Plaintiffs have failed to demonstrate that all putative class members will suffer greater safety risks as a result of the school closings.

In support of their theory, Plaintiffs offer the expert report of Dr. Martin Hagedorn, a professor at the University of Illinois at Chicago who researches Chicago gangs. (Pls.' Mem. Class Cert., Ex. 4.) Hagedorn also testified at the preliminary injunction hearing.[11] According to Hagedorn, as a result of the school closures, students will be forced to walk across unfamiliar gang boundaries and students with disabilities will be especially susceptible to gang recruitment. (PI Tr. 275, 279.) But Hagedorn's maps of Chicago gang boundaries demonstrate how the boundaries vary considerably depending upon the particular school and neighborhood at issue. (PI Ex. Px 89B2, 89B4, 89B5, 89B8, 89B11.) Moreover, to arrive at his conclusions, Hagedorn reviewed the closures of only six schools – Pope, Hughes, Paderewski, Peabody, Garvey, and Cohn – and he provided no evidence that these six schools are representative of the other forty-three closing schools. (PI Tr. 302; Pls.' Mem. Class Cert., Ex. 4 at 9.) And like Witte, Hagedorn

---

[11] At the preliminary injunction hearing, Defendants objected to the qualification of Dr. Hagedorn as an expert as to whether disabled students experience disproportionately greater exposure to gang violence relative to their peers. (PI Tr. 258) Hagedorn admits that he has no professional expertise with respect to special education children. Accordingly, Hagedorn was not permitted to testify as to whether students with disabilities would be disproportionately exposed to gang violence as a result of the school closures; however, he was allowed to testify as to Chicago gang boundaries and the potential recruitment of disabled students by gang members. (PI Tr. 292.)

did not review any information pertaining to the named Plaintiffs. Hagedorn's limited review is particularly troubling given his belief that gang lines are "fluid and changing." (*Id.*) And, as Hagedorn himself admits, "[e]ach school closing presents different, unique problems with gangs." (Pls.' Mem., Ex. 4 at 7.) Furthermore, Plaintiffs fail to explain how Hagedorn's analysis would apply in those instances where students will be remaining at the same location post-closure, as at Williams.[12] Lastly, Hagedorn opines that CPS's Safe Passage Program, a safety program that provides adult "community watchers" and neighborhood "safe havens" along specifically designated routes children take to school, is ineffective to address the increased risks to gang violence. But Hagedorn admitted that he has not evaluated the efficacy of the program as a whole, nor has he reviewed the individual transition plans for each closing school or any documents other than vendor contracts for the program and the deposition of Tom Tyrrell. (PI Tr. 276, 307-09; Pls.' Mem. Class Cert., Ex. 4 at 11; PI Ex. Dx 60). Nevertheless, in his report, Hagedorn states that he found it "most troubling" that CPS had not devised specific safety plans tailored to the specific schools. (Pls.' Mem. Class Cert., Ex. 5 at 7.) Since the time of his report, however, CPS has developed specific plans for each school. (PI Ex Dx 60.) At the certification stage, the Court need not decide whether Hagedorn's opinion is correct. The Court need only conclude that numerous variations at both the school level and individual student level preclude a finding of common injury.

---

[12]     As Tom Tyrrell, the CPS official who is responsible for managing the closings, testified, there are four different closing-receiving scenarios: (1) a simple closing where one school is closed, and the students from the closing school are assigned to one receiving school; (2) a scenario where the students of one closing school are assigned to more than one receiving school; (3) a scenario where students from more than one closing school are assigned to one receiving school; and (4) a reverse consolidation, where the students of a closed school remain in the same location but are combined in that same location with students from the receiving school. (PI Tr. 698; *see generally* Defs.' Resp., Ex. A (providing examples of the variations)).

In sum, Plaintiffs have failed to establish by a preponderance of the evidence that they and putative class members will "suffer[] the same injury" as is required to satisfy Rule 23(a)(2). *See Jamie S.*, 668 F.3d at 497 (internal citations and quotations omitted).

### 4.     Utilization Criteria

Finally, Plaintiffs allege that Defendants used a uniform formula to identify schools for closure and that this formula resulted in the disproportionate closure of schools with special education classes.  (Compl. ¶¶ 83-89.)  But, even assuming for the purposes of argument that a disproportionately greater number of schools with special education classes were closed as a result of this formula, as previously discussed, Plaintiffs have failed to show that the transfer of students from these schools to receiving schools would result in academic, emotional, or other harm cognizable on a class-wide basis.  For example, some putative class members likely will be transferred from underutilized, low-performing schools into more efficiently used, higher-performing schools, a process that Plaintiffs' expert acknowledged can benefit students academically.  Furthermore, Plaintiffs' alternative proposal would have the opposite effect that Plaintiffs intend and result in a greater number of schools with special education programs being classified as "underutilized" rather than fewer.

The primary criterion the Board used to identify schools for closure was "utilization." (Pls.' Mem. Class Cert. Ex. 18; PI Ex Dx 6; PI Tr. 507.)  Based on the Board's capacity calculation, CPS has over 510,000 seats, but just over 430,000 students enrolled.  (PI Tr. 516.) The Board believed that by addressing underutilization it could reinvest its limited resources to provide students with a better educational environment.  (*Id.* 507.)

To determine whether a school was underutilized, CPS calculated a utilization rate for each school using a four-step process.  (*Id.* 508-09.)  First, CPS counted the number of

classrooms in a school, excluding spaces such as lunch rooms, auditoriums, and gymnasiums. (*Id.*)  Second, CPS multiplied this number by seventy-six percent to estimate the school's "allotted homerooms."  (*Id.* 509-10.)  CPS used seventy-six percent because in a prototypical school, seventy-six percent of all classrooms are used as "homerooms," while the other twenty-four percent are used as "ancillary rooms" for non-homeroom purposes such as special education programming, computer labs, art rooms, music rooms, or whatever the principal deems in the best interests of the students.  (*Id.* 509-10, 561.)[13]  Third, CPS multiplied the allotted homerooms by thirty, the number of students in an efficiently-utilized classroom, to calculate the school's "ideal student capacity."  (*Id.* 510.)  Finally, CPS divided the school's actual student enrollment on the twentieth day of school by its ideal capacity.  (*Id.*)  This percentage was the school's utilization rate.  (*Id.*)  Schools with utilization rates less than eighty percent were classified as "underutilized."  (*Id.*)

Plaintiffs allege that this utilization rate calculation discriminated against students in special education programs in two ways.  First, Plaintiffs allege that by excluding classrooms used for special education from the seventy-six percent of school classrooms allocated for homeroom purposes, Defendants' criteria did not account for special education classrooms.  (PI Tr. 560-63.)  But, in fact, the exclusion of rooms used for special education from the seventy-six percent factor *benefited* putative ADA class members, because it increased the utilization rate of schools that use ancillary rooms for special education programs, making them less likely to be closed.  A simple example illustrates this.  Take a ten-classroom school with one hundred students where two rooms are being used for special education programming.  Under Defendants' criteria, the utilization rate would be 44% (10 classrooms * 76% = 7.6 allocated

---

[13]     A room was categorized as a "homeroom" or "ancillary classroom" based upon the intended use.  (PI Ex Dx 6 at 2-3.)

homerooms; 7.6 allocated homerooms * 30 students in an efficiently-used classroom = 228 ideal student capacity; 100 enrolled students / 228 ideal student capacity = 44%). But if the rooms that the school is using for special education are "counted" as homerooms and not ancillary rooms, as Plaintiffs suggest would be appropriate (PI Tr. 561), then the utilization rate would be 33% (10 classrooms * 100%[14] = 10 allocated homerooms; 10 allocated homerooms * 30 students in an efficiently-used classroom = 300 ideal student capacity; 100 enrolled students / 300 ideal student capacity = 33%). Thus, under their own theory of harm, Plaintiffs have failed to establish that Defendants' exclusion of classrooms used for special education purposes from the classrooms allocated for homeroom purposes injured putative class members on a class-wide basis.

Second, Plaintiffs allege that the Board's use of thirty students as a classroom's ideal capacity discriminates against special education students because special education students are often in self-contained classrooms with less than thirty students, known as "cluster programs." (Compl. ¶¶ 86-89; PI Tr. 558.) But, even assuming this is the case, only thirty percent of all CPS schools have cluster programs, and Plantiffs' theory would not apply to those schools that provide special education services but do not have cluster programs. (PI Tr. 780.)[15] Furthermore, most special education students are not in cluster programs; they spend most of their time in general education classrooms. For example, other than the forty-five minutes McDaniel's son, E.E., receives in speech therapy once a week, he spends his time in a general education classroom. (Defs.' Resp., Ex. G at 10.) Among all students with disabilities in the closing schools, 75% percent spend at least forty percent of their time in general education classrooms; less than 25% are in cluster programs. (PI Tr. 778.) Thus, even if Plaintiffs'

---

[14]     The 76% factor now becomes 100% because the special education rooms, which were previously categories as "ancillary rooms," are now counted as "homerooms," and our hypothetical school now has 10.0 allocated homerooms, rather than 7.6.

[15]     In comparison, 30% of the schools scheduled for closure have cluster programs. (*Id.*)

allegations about the Board's use of thirty students as "ideal capacity" discriminates against students in cluster programs, a question the Court need not decide for purposes of this motion, Plaintiffs have failed to establish that this criterion harms putative class members on a class-wide basis.

Furthermore, Plaintiffs' putative ADA class includes "[t]he parents of all minor students and all students who are currently in special education programs *but attend general education or "inclusion" classes with non-disabled students* at one of the 49 elementary schools that Defendants recommended for closure." (Pls.' Mem. Class. Cert. 2) (emphasis added). Thus, students in cluster programs who spend all of their time in classrooms with less than thirty students are not even in the putative ADA class.

In sum, Plaintiffs have failed to establish by a preponderance of the evidence that putative ADA class members will "suffer the same injury" as is required to satisfy Rule 23(a)(2)'s commonality requirement. *See Jamie S.*, 668 F.3d at 497.

### B.      ICRA Class

Plaintiffs allege that the ICRA class satisfies Rule 23(a)(2)'s commonality requirement because "Plaintiffs' rights under the ICRA have been violated by Defendants' actions." (Pls.' Mem. Class Cert. 8.) In particular, Plaintiffs allege that Defendants' "utilization policy, while facially neutral, has an adverse impact on African-American students" because "African-American students make up roughly 88 percent of the students who will be displaced by the proposed closings, but they represent only 40 percent of all the students in the Chicago public schools." (Pls.' Reply 8.) But as with their ADA claims, Plaintiffs have failed to identify a common injury resulting from the school closings that harms putative ICRA class members on a class-wide basis. Indeed, as discussed above, Plaintiffs' own expert acknowledged that many

putative ICRA class members may benefit from the closing of their schools and the opportunity to attend a higher-performing school.

Plaintiffs' own testimony illustrates the lack of class-wide harm. For example, Ross is concerned primarily about safety and security. (Defs.' Resp., Ex. H at 111-13.) She believes students at closing schools are going to be harmed by the school closings because of gang and "territorial" issues, although she is unsure whether her son, M.R., will be harmed by gang issues at his new school, Faraday. (*Id*.) Additionally, although she is not worried about M.R.'s safety on his new route to Faraday, which is only three blocks from her house, she is concerned that he will be walking past high school students smoking cigarettes and hugging and kissing each other. (*Id.* at 117, 119-20.) She is not concerned, however, about academic issues or education harm; M.R. is going to a higher-performing school. (*Id.* at 121.)

On the other hand, Newman is concerned primarily about academic issues. She alleges that her daughter, A.S., will be harmed by the instability that comes with having new teachers and classmates. (*Id.*, Ex. I at 57.) She does not know whether A.S. will receive a lesser-quality education at her receiving school, but she does not share any of the safety concerns espoused by Ross because A.S. will be attending school in the exact same building next year. (*Id.*at 45.)

Finally, McDaniel has no specific concerns about her son, E.E., for the 2013-2014 school year because his school is not closing and he will be attending the same school as he did last year. (*Id.*, Ex. G at 27, 28, 31.) None of the harms alleged by Ross or Newman, therefore, apply to McDaniel. The varied concerns and alleged harms among just these Plaintiffs demonstrate the lack of common injury across putative ICRA class members whose children are in schools slated for closure.

Furthermore, Plaintiffs ICRA class includes "students in . . . the receiving schools." (Pls.' Mem. Class Cert. 2.) Plaintiffs have provided no evidence to suggest that students in the receiving schools will suffer the same injury on a class-wide basis due to the school closings. Indeed, no Plaintiff has a child in a receiving school, and some of the alleged harms that will be suffered by students in closing schools are not even applicable to students in receiving schools – for example, changing their route to school. Additionally, just as the concerns amongst parents and students in the closing schools will vary based on specific facts and circumstances unique to each school and student, so too will concerns amongst parents and students in the receiving schools. The absence of any "common harm" allegedly suffered by the putative ICRA class fails to satisfy Rule 23(a)(2)'s commonality requirement. *See Dukes*, 131 S. Ct. at 2551; *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 843 (5th Cir. 2012) ("[I]f the merits of each class member's . . . claims depend on an individualized inquiry regarding the harm or risk of harm experienced by each class member . . . then dissimilarities within the proposed class would appear to prevent the class claims from asserting a common question of law that will resolve an issue that is central to the validity of each one of the claims in one stroke.") (internal quotations omitted).

## II.     Rules 23(a)(3) & (4): Typicality and Adequacy of Representation

Defendants also argue that Plaintiffs have not satisfied Rules 23(a)(3) and 23(a)(4) as to either the ADA or ICRA class. Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "In many cases . . . the requirement of typicality merges with the further requirement that the class representative 'will fairly and adequately protect the interests of the class.'" *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (quoting Fed. R. Civ. P. 23(a)(4)). To satisfy Rule 23(a)(3) typicality, "there must be enough congruence between the

named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586. Similarly, to meet Rule 23(a)(4)'s adequacy-of-representation requirement, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Here, Plaintiffs argue that the ADA and ICRA classes satisfy Rules 23(a)(3) and (a)(4) because Plaintiffs' claims, "like other class members' claims, arise from Defendants' decision to close 49 elementary schools . . . [and] [t]hat decision has caused their legal injury, namely the violation of their rights under the ADA and ICRA." (Pls.' Mem. Class Cert. 10.) Plaintiffs also contend that "[t]he representative here, both the named Plaintiffs as well as the class counsel, adequately represent the putative class members." (*Id.* 11.) The Court discusses Rules 23(a)(3) and (4) as to each proposed class in turn.

## A. ADA Class

As to the ADA class, Plaintiffs contend that they satisfy the typicality element because all students in special education programs will suffer harm as a result of the school closings. (Pls.' Mem. Class Cert. 10.) But, as discussed above, Plaintiffs have failed to establish this. Additionally, McDaniel does not satisfy the typicality and adequacy requirement because her son's school is not closing, and she alleges no injury as to him. Thus, her claims are not typical of the putative ADA class, and she cannot adequately represent the class. *See Falcon*, 457 U.S. at 156.

Similarly, Ross is not an adequate class representative because, while she does not believe that her son's school should be closed, she has no problem with other, underperforming

schools being closed. (Defs.' Resp., Ex. H at 106-07.) This conflict jeopardizes her ability to represent putative ADA class members whose children attend the other schools slated to close. Moreover, Ross' ability to represent putative class members is compromised by her belief that she cannot speak on behalf of anyone else's children because she does not know what their needs are or whether their receiving schools can implement their children's IEPs. (*Id.* at 88, 104-05.) Finally, Ross mistakenly believes that the class she is representing includes staff, administrators, teachers, cafeteria workers, and janitors. (*Id.* at 62.) In short, Ross has not established that she can adequately represent the interests of the putative ADA class.

Furthermore, many of the issues that cut against commonality also preclude a finding of typicality. For example, in light of Lipman's testimony that 12% of students whose schools will close may benefit from the closures, it may well be that some parents in the putative ADA class welcome the opportunity to attend better performing schools. Plaintiffs have not explained how the named Plaintiffs would satisfy the typicality and adequacy-of-representation requirements as to those class members. Similarly, a number of parents already have requested and participated in IEP meetings to address the individual transitional needs of their child. Those parents, who are putative ADA class members, do not suffer Plaintiffs' alleged harm of inadequate IEPs. Plaintiffs have not explained how they would represent those class members as well. These concerns are particularly important here, where Plaintiffs are seeking class-wide injunctive relief under Rule 23(b)(2), and individual class members are not provided formal notice or permitted to "opt out" as in Rule 23(b)(3) classes. In the end, Plaintiffs have failed to establish by a preponderance of the evidence that they have satisfied the typicality and adequacy-of-representation requirements of Rule 23(a)(3) and (4) as to the ADA class.

## B.    ICRA Class

Similar problems plague Plaintiffs' putative ICRA class.  Plaintiffs argue that their claims are typical of the putative ICRA class because "the disproportionate number of African American students in the closing schools will suffer harm as a result of the proposed closings . . . [and] will be subject to both the negative impacts of such closings and the generally acknowledged harms that arise from racial discrimination."  (Pls.' Mem. Class Cert. 10.)  But again, as discussed, Plaintiffs have failed to establish that putative ICRA class members will suffer the same injury on a class-wide basis.  Plaintiffs' own circumstances highlight this.  McDaniel fails the typicality and adequacy of representation requirements as to the putative ICRA class because her son does not attend a closing or receiving school.  Ross fails these requirements because her son, M.R., is attending a higher-performing school next year, so her claims are not typical of Plaintiffs' claims that students will be harmed because they are not being placed in higher-performing schools.  (Compl. ¶ 203.)  Moreover, Ross has no safety concerns regarding the route M.R. will take to his new school, nor is Ross claiming any educational harm to M.R. as a result of the closings.  Finally, Newman fails the typicality and adequacy requirements because her child is not changing buildings, so she does not share many of the concerns asserted on behalf of the class.

Furthermore, none of Plaintiffs' children are typical of the claims of any students in the receiving schools, yet the putative ICRA class includes "students in . . . the receiving schools." Plaintiffs have offered no evidence that the claims of students in receiving schools are typical of those in the closing schools or that their interests are sufficiently aligned so that they would be adequately represented by Plaintiffs.  Indeed, some of Plaintiffs' alleged harms, such as the increased risk of going to new neighborhoods or becoming familiar with a new school

environment, will not be experienced by students in the receiving schools at all. Thus, Plaintiffs have failed to establish that their claims are typical of the claims of putative ICRA class members or that they can adequately represent putative ICRA class members.

## III.    Rule 23(b)(2): Injunctive Relief

Finally, under Rule 23(b)(2), Plaintiffs must demonstrate that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 (internal quotations omitted). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* (emphasis in original); *Jamie S.*, 668 F.3d at 499. Moreover, "[t]hat the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final." *Jamie S.*, 668 F.3d at 499 (citing *Dukes*, 131 S. Ct. at 2557.)

Here, Plaintiffs have failed to establish that the injunctive relief they seek – keeping the schools open on a permanent basis – would provide relief that would benefit the entire putative class. Although Plaintiffs have structured their case around a claim for class-wide injunctive relief, for the reasons discussed above, whether their requested relief would benefit or harm each putative class member requires an individualized determination. Thus, Plaintiffs have failed to

satisfy the requirements of Rule 23(b)(2). *See Kartman*, 634 F.3d at 893 n.8 ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate.") (emphasis in original); *Casa Orland Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 200 (5th Cir. 2010) (finding that Rule 23(b)(2) certification was not appropriate when only some of the proposed class members would benefit from the injunction); *Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) ("What is important [under 23(b)(2)] is that the relief sought by the named plaintiffs should benefit the entire class.").

## Conclusion

For the reasons herein, the Court denies Plaintiffs' motion for class certification [14].


**SO ORDERED**                    **ENTER: 8/9/13**

_____

**JOHN Z. LEE**
**U.S. District Judge**